# **<u>Exhibit 1</u>**

# Morgan Lewis

**Brian W. Shaffer**
+1.215.963.5103
Brian.shaffer@morganlewis.com

September 17, 2019

**BY HAND DELIVERY**
JAMS New York Arbitration Services
NY Times Building
620 8th Ave
34th Floor
New York, NY 10018

Dear JAMS:

We represent Andrew Hohns ("Hohns") and write to initiate an arbitration between Mr. Hohns and Mariner Investment Group, LLC ("Mariner"). Enclosed please find the materials required to initiate the arbitration between Mr. Hohns and Mariner, including two copies of our Demand for Arbitration, two copies of our proof of service of the Demand on Mariner, the agreement between Hohns and Mariner containing the arbitration clause, and a check for the amount required to initiate the arbitration.

Respectfully,

Brian W. Shaffer

---

**Morgan, Lewis & Bockius** LLP

1701 Market Street
Philadelphia, PA  19103-2921
United States

☏ +1.215.963.5000
🖷 +1.215.963.5001

# Demand for Arbitration Form

## Instructions for Submittal of Arbitration to JAMS

## INSTRUCTIONS

Please submit this form to your local JAMS Resolution Center. Once the below items are received, a JAMS professional will contact all parties to commence and coordinate the arbitration process, including the appointment of an arbitrator and scheduling a hearing date.

📞 **1-800-352-JAMS**
🖥 **www.jamsadr.com**

If you wish to proceed with an arbitration by executing and serving a Demand for Arbitration on the appropriate party, please submit the following items to JAMS with the requested number of copies:

**A. Demand for Arbitration** *(2 copies)*

**B. Proof of service of the Demand on the appropriate party** *(2 copies)*

**C. Entire contract containing the arbitration clause** *(2 copies)*
- *To the extent there are any court orders or stipulations relevant to this arbitration demand, e.g. an order compelling arbitration, please also include two copies.*

**D. Administrative Fees**
- *For two-party matters, the Filing Fee is $1,500. For matters involving three or more parties, the filing fee is $2,000. The entire Filing Fee must be paid in full to expedite the commencement of the proceedings. Thereafter, a Case Management Fee of 12% will be assessed against all Professional Fees, including time spent for hearings, pre- and post-hearing reading and research and award preparation. JAMS also charges a $1,500 filing fee for counterclaims. For matters involving consumers, the consumer is only required to pay $250. See JAMS Policy on Consumer Arbitrations Pursuant to Pre-Dispute Clauses. For matters based on a clause or agreement that is required as a condition of employment, the employee is only required to pay $400. See JAMS Policy on Employment Arbitrations, Minimum Standards of Fairness.*

- *A refund of $600 will be issued if the matter is withdrawn within five days of filing. After five days, the filing fee is non-refundable.*

**Once completed, please submit to your local JAMS Resolution Center.**
*Resolution Center locations can be found on the JAMS website at: http://www.jamsadr.com/locations/.*



# Demand for Arbitration Form (continued)

Instructions for Submittal of Arbitration to JAMS

## TO RESPONDENT (PARTY ON WHOM DEMAND FOR ARBITRATION IS MADE)

Add more respondents on **page 6.**

| | |
|---|---|
| RESPONDENT NAME | Mariner Investment Group, LLC |
| ADDRESS | 500 Mamaroneck Avenue |

| CITY | Harrison | STATE | New York | ZIP | 10528 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | peter@marinercapital.com |
|---|---|---|---|---|---|

### RESPONDENT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Matthew Solum |
| FIRM/ COMPANY | Kirkland & Ellis LLP |
| ADDRESS | 601 Lexington Avenue |

| CITY | New York | STATE | New York | ZIP | 10022 |
|---|---|---|---|---|---|

| PHONE | 212.446.4688 | FAX | | EMAIL | msolum@kirkland.com |
|---|---|---|---|---|---|

## FROM CLAIMANT

Add more claimants on **page 7.**

| | |
|---|---|
| CLAIMANT NAME | Andrew Hohns |
| ADDRESS | 231 Spruce St. |

| CITY | Philadelphia | STATE | PA | ZIP | 19106 |
|---|---|---|---|---|---|

| PHONE | | FAX | | EMAIL | andrew.hohns@gmail.com |
|---|---|---|---|---|---|

### CLAIMANT'S REPRESENTATIVE OR ATTORNEY (IF KNOWN)

| | |
|---|---|
| REPRESENTATIVE/ATTORNEY | Brian W. Shaffer |
| FIRM/ COMPANY | Morgan, Lewis & Bockius LLP |
| ADDRESS | 1701 Market Street |

| CITY | Philadelphia | STATE | PA | ZIP | 19103 |
|---|---|---|---|---|---|

| PHONE | 215.963.5000 | FAX | | EMAIL | brian.shaffer@morganlewis.com |
|---|---|---|---|---|---|

# Demand for Arbitration Form (continued)

### Instructions for Submittal of Arbitration to JAMS

## MEDIATION IN ADVANCE OF THE ARBITRATION

☐ If mediation in advance of the arbitration is desired, please check here and a JAMS Case Manager will assist the parties in coordinating a mediation session.

## NATURE OF DISPUTE / CLAIMS & RELIEF SOUGHT BY CLAIMANT

CLAIMANT HEREBY DEMANDS THAT YOU SUBMIT THE FOLLOWING DISPUTE TO FINAL AND BINDING ARBITRATION.
A MORE DETAILED STATEMENT OF CLAIMS MAY BE ATTACHED IF NEEDED.

Please see the attached Demand for Arbitration.

AMOUNT IN CONTROVERSY (US DOLLARS) _____



# Demand for Arbitration Form (continued)
### Instructions for Submittal of Arbitration to JAMS

## ARBITRATION AGREEMENT
This demand is made pursuant to the arbitration agreement which the parties made as follows. **Please cite location of arbitration provision and attach <u>two copies</u> of entire agreement.**

**ARBITRATION PROVISION LOCATION**

The arbitration provision is in section 7 of the parties' Mariner-Hohns Buyout Option Agreement, made as of March 13, 2012, and which is attached hereto.

## RESPONSE
The respondent may file a response and counter-claim to the above-stated claim according to the applicable arbitration rules. **Send the original response and counter-claim to the claimant at the address stated above with <u>two copies</u> to JAMS.**

## REQUEST FOR HEARING

**REQUESTED LOCATION**   New York, New York

## ELECTION FOR EXPEDITED PROCEDURES (IF COMPREHENSIVE RULES APPLY)
See: **Comprehensive Rule 16.1**

☐   By checking the box to the left, Claimant requests that the Expedited Procedures described in JAMS Comprehensive Rules 16.1 and 16.2 be applied in this matter. Respondent shall indicate not later than seven (7) days from the date this Demand is served whether it agrees to the Expedited Procedures.

## SUBMISSION INFORMATION

**SIGNATURE**   *Brian W. Shaffer*   **DATE**   09/17/2019

**NAME (PRINT/TYPED)**   Brian W. Shaffer

**JAMS NEW YORK**

| | |
|---|---|
| ANDREW HOHNS,<br><br>         Claimant,<br><br>  -v.-<br><br>MARINER INVESTMENT GROUP, LLC<br><br><br>       Respondent. | Case No._____<br><br>**DEMAND FOR ARBITRATION** |

## NATURE OF THE ARBITRATION

1.    Claimant Andrew Hohns ("Claimant" or "Hohns"), by and through his undersigned counsel, brings this Demand for Arbitration ("Demand") against respondent Mariner Investment Group, LLC ("Respondent" or "Mariner") pursuant to the arbitration agreement contained in section 7 of the parties' Mariner-Hohns Buyout Option Agreement, made as of March 13, 2012 ("Buyout Option Agreement"), and which is attached hereto as **Exhibit A**.

2.    This arbitration arises out of certain contractual rights and obligations at issue between the parties in connection with an infrastructure fund management platform, the general conduct of which is primarily governed by the terms of a Sponsorship Agreement, made as of March 13, 2012 ("Sponsorship Agreement"), an Employment Agreement effective as of March 13, 2012 ("Employment Agreement"), and the Buyout Option Agreement.  Hohns and Mariner are each parties to these three agreements.  The Sponsorship Agreement is attached hereto as **Exhibit B**.  The Employment Agreement is attached hereto as **Exhibit C**.[1]

---

[1] Section 4 of the Employment Agreement ("Compensation") describes, in detail, the specific amounts and manners in which Hohns is compensated for his employment as President and CEO

3.      Specifically, the arbitration requires resolution of a threshold, legal issue of contract interpretation that must be made in connection with Hohns's right to purchase Mariner's interest in Mariner Infrastructure Investment Management LLC ("MIIM"), an entity established to facilitate the parties' management of such business, and which also is party to the Sponsorship Agreement. *See* Ex. B at p. 3, § 2.

4.      Claimant herein pleads allegations and a claim for declaratory relief in support of his position concerning the following issue of contract interpretation that must be resolved by the Panel:

> Whether, consistent with the plain language of terms and conditions contained in binding contracts entered into between the parties, the qualitative measure of consideration to be paid for Mariner's interest in MIIM factors only projected future revenues on assets that are actually under management at such time as any of the Buyout Option Agreement's Buyout Triggers are deemed to occur; or whether it should include projected future revenues associated with either (a) investments that had not yet been made and/or (b) investment funds that had not yet come into existence, in both cases at such time of any Buyout Trigger. The measure of consideration is contractually defined and based solely on "the fair market value of the Mariner Revenue Share" earned from "Specified Funds" actually in existence and under operation "at such time" as a Buyout Trigger is deemed to occur. Accordingly, only revenues earned on Fund I and Fund II can be factored in the calculation of "the fair market value of Mariner Revenue Share at such time" as a Buyout Trigger is deemed to occur.  Contrary to Mariner's view, the qualitative measure of consideration does <u>not</u> also include a component of future revenue on all possible assets that Hohns might someday in the future manage through products or other ventures that might possibly be developed, based on potential commitments, goodwill, or otherwise.

---

of MIIM.  That information is non-public, personal and private, and immaterial to resolution of the parties' dispute.  Hohns's compensation has therefore been redacted.

## ARBITRAL AND LEGAL AUTHORITY[2]

5.      This arbitration Demand is properly brought before JAMS pursuant to the parties'

"Arbitration" agreement contained in section 7 of the Buyout Option Agreement (the

"Arbitration Provision"), which specifies as follows:

> Arbitration. Any controversy or dispute between the parties arising out of any of the terms or conditions of this Agreement shall be submitted to an independent professional arbitration association in New York. Any arbitrator(s) selected must have significant arbitration experience relating to the securities industry. The Parties shall select an arbitrator by mutual agreement within thirty (30) days of the date of the demand for arbitration. If the Parties are unable to agree on the selection of an arbitrator within such time, each Party shall select an arbitrator and the two arbitrators shall select a third arbitrator. Any of the two of the three arbitrators that agree shall decide the matter. The cost of the arbitration shall be borne equally by the Parties, unless the arbitrator(s) order otherwise. The arbitration shall be binding with no right of appeal.

6.      The Federal Arbitration Act applies to, and confirms validity of, the Arbitration

Provision of the Buyout Option Agreement:

>  A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

7.      Further, the plain language of the Arbitration Provision provides the Arbitrators

with broad authority to resolve "any controversy or dispute," including the declaratory relief

requested herein, as "there is no express restriction on the remedies an arbitrator is authorized to

---

[2] Section 2 of the Buyout Option Agreement is the parties' "Buyout Option" provision, which is explained in further detail in this Demand.  Section 2 of the Buyout Option Agreement is not an arbitration agreement between the parties.  Among other things, a portion of section 2 specifies a procedure through which—if Hohns elects to purchase Mariner's interest in MIIM—"expert evaluators" would mathematically quantify the qualitative measure of consideration exchanged for Mariner's interest in MIIM.

award in the arbitration agreement." *See Sanluis Developments, L.L.C. v. CCP Sanluis, L.L.C.*, 498 F. Supp. 2d 699, 706 (S.D.N.Y. 2007).

8.      Rule 24(c) of the currently-operative JAMS Comprehensive Arbitration Rules and Procedures provides that:

> In determining the merits of the dispute, the Arbitrator shall be guided by the rules of law agreed upon by the Parties. In the absence of such agreement, the Arbitrator shall be guided by the rules of law and equity that he or she deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy.

9.      The requested declaratory relief is warranted under New York law, which governs this dispute. *See* Buyout Option Agreement, § 10 ("This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York . . . ."). The requested declaratory relief will serve a useful purpose in clarifying or settling the legal issues between the parties; will finalize the controversy and offer relief from uncertainty; is not being used merely for procedural fencing or a race to *res judicata*; will not increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and there is no better or more effective remedy. *See, e.g.*, *N.Y. v. Solvent Chem. Co.*, 664 F.3d 22, 26 (2d Cir. 2011).

## ALLEGATIONS

### *The Parties and their Contractual Relationships and Funds*

10.     Claimant Hohns is an individual and a citizen of the Commonwealth of Pennsylvania currently residing in Philadelphia, Pennsylvania.

11.     Respondent Mariner is an LLC formed under the laws of Delaware. Mariner's sole and controlling member is MIG Holdings, LLC, which also is a limited liability company

formed under the laws of Delaware.  Through a series of LLCs and corporations, the ownership

and control of MIG Holdings, LLC, and thus ultimately of Mariner, traces to a Japanese

corporation named ORIX Corporation (ORIX Kabushiki Kaisha), which, on information and

belief, is organized under the laws of Japan.

12.     Hohns and Mariner are parties to an infrastructure fund management platform, the

conduct of which is primarily governed by the terms of the Sponsorship Agreement, the Buyout

Option Agreement, and the Employment Agreement.

13.     A principle objective of the parties' business under the Sponsorship Agreement is

to engage in infrastructure-related investment activities relating to the primary investment strategy

of investment in securitizations of project finance or other infrastructure-related credit assets.  *See*

Ex. B, pp. 1, 2.  Under the Sponsorship Agreement, Hohns is President and Chief Executive

Officer of MIIM.  *See id.* at p. 3, § 2.  Hohns's position as President and Chief Executive Officer of

MIIM is the subject of the Employment Agreement.  *See* Ex. C.

14.     In his capacity as President and Chief Executive Officer of MIIM, Hohns is

responsible for developing and managing certain "Specified Funds," the purposes of which are to

enable the parties' credit-related infrastructure investment strategies.  *See* Ex. B at pp.  3-4, §§ 2, 3;

Ex. C at p. 1, § 2.

15.     For its part, Mariner is obligated to provide, among other services, "risk

management," "internal accounting, human resources, information technology . . . and all other

back office functions"; "meeting space"; "compliance services"; and assistance with development

of investor correspondence.  *See* Ex. B at p. 7, § 6.

16.     Generally, Mariner has a pro rata economic interest of 33% in gross revenue earned

under the Sponsorship Agreement.  *See* Ex. B, Schedule A.

17.     The parties also are signatories to a fourth relevant agreement, the Limited Liability Company Agreement of IIFC II-A GP, LLC, effective as of June 5, 2019 ("IIFC II-A GP, LLC Agreement"), and attached hereto as **Exhibit D**.

18.     Hohns signed the IIFC II-A GP, LLC Agreement in his capacity as Managing Member of IIFC Management LLC, which, under the Sponsorship Agreement, is the entity designated to manage the "Initial Fund" and other funds launched under the Sponsorship Agreement, *i.e.*, the International Infrastructure Finance Company Fund ("IIFC Fund I" or "Fund I"). *See* Ex. B. at pp. 1-4, §§ 2, 3.

19.     The Sponsorship Agreement defines "Specified Fund" as the funds and other products (such as funds-of-one) through which the parties execute their credit-related infrastructure investment strategy. *Id.* at p. 2, p. 3 § 2(a), p. 4 § 3(a).

20.     On December 12, 2013, IIFC Fund I had its initial closing.  On the same date, Mariner Breakwater, L.P., ("Breakwater Fund"), a fund-of-one with a similar investment strategy, also had its initial closing.  On January 9, 2017, IIFC Fund II ("IIFC Fund II" or "Fund II") had its initial closing.  As of year-end 2018, the Breakwater Fund had substantially wound-down operations and all of its investments had matured.  As such, IIFC Fund I and IIFC Fund II were the only Specified Funds actually in existence and under operation at the time of the applicable Buyout Trigger's occurrence.

21.     IIFC Fund I and IIFC Fund II were the only Specified Funds in operation under the Sponsorship Agreement until June 19, 2019, when IIFC Fund II-A ("Fund II-A") was formed in connection with the IIFC II-A GP, LLC Agreement.  IIFC Fund II-A has not yet had its initial closing.  The Parties have agreed that, for purposes of this arbitration, Fund II-A is not a Specified Fund in existence at such time the applicable Buyout Trigger occurred.  *See* Ex. D, at §7(d).

*The Buyout Option Provision in the Parties' Buyout Option Agreement*

22.     The parties entered into the Buyout Option Agreement contemporaneously with the Sponsorship Agreement.

23.     The Buyout Option Agreement embodies the parties' "desire to set forth their agreement regarding certain key terms and conditions regarding the sale and buyout options of Hohns and Mariner." *See* Ex. A at p. 1.

24.     The parties' current dispute arises out of their controversy over the meaning of contractual language used in section 2 of the Buyout Option Agreement, including terms that are defined in the Sponsorship Agreement.

25.     Section 2 of the Buyout Option Agreement specifically states as follows:

Buyout Option. Upon the occurrence of any Buyout Trigger, Hohns shall have the right to purchase (the **"Buyout Option"**), in whole but not in part, Mariner's entire interest in MIIM, either through the purchase of Mariner's entire interest in MIIM or through the purchase of all contracts and rights to management fees, performance fees and allocations to which MIIM is entitled, upon payment to Mariner of the fair market value of the Mariner Revenue Share at such time. Such fair market value shall be determined by an independent nationally recognized expert evaluator of investment management businesses mutually selected by the Parties, which expert shall have experience in valuing investment fund managers. If Mariner and Hohns cannot agree on an evaluator, each shall choose an evaluator, and the two evaluators shall select a third evaluator with the foregoing qualifications, and any two of the three evaluators that agree shall decide the fair market value of the Mariner Revenue Share. If the three evaluators do not agree, the fair market value of the Mariner Revenue Share shall be the average of the three values determined by the evaluators. Hohns shall have ninety (90) days after the occurrence of the applicable Buyout Trigger to exercise, by written notice to Mariner, such Buyout Option. Hohns and Mariner shall act in good faith to complete the sale and purchase transaction pursuant to the exercise of the Buyout Option within 180 days following Hohns's exercise of such Buyout Option.

26.     "Buyout Trigger" is a defined term in section 1 of the Buyout Option Agreement and specifies the following circumstances triggering Hohns's Buyout Option:

(a)     the expiration of a period of sixty (60) months following the date of the first closing of the Initial Fund, or

7

(b)     the occurrence of a Key Executive Change, or

(c)     the termination without Cause of Hohns as President and CEO of MIIM, or

(d)     the resignation with Good Reason by Hohns as President and CEO of MIIM, or

(e)     a material breach by Mariner of any of its obligations as set forth in the Sponsorship Agreement, which remains uncured for a period of sixty (60) days following the date on which written notice of the breach was provided, or

(f)     bankruptcy or insolvency of Mariner, or

(g)     each and any applicable event as described in Section 3.

Although subsection 1(a) is the operative Buyout Trigger here, the nature of the other Buyout Triggers is relevant to the parties' respective arguments, supports Hohns's position, and undermines Mariner's.  *See* ¶ 44 *infra.*

27.     Section 2 of the Buyout Option Agreement establishes a number of rights, requirements, and procedures concerning Hohns's option to purchase Mariner's interest in MIIM:

a.     The timing upon which Hohns may elect to exercise his right to purchase Mariner's interest in MIIM, by reference to the occurrence of the "Buyout Triggers" defined by section 1 of the Buyout Option Agreement.

b.     The extent of Mariner's interest in MIIM that must be considered for purchase if Hohns exercises his purchase right, *i.e.,* Mariner's "entire" interest.

c.     The qualitative measure of the consideration that Hohns must exchange for Mariner's entire interest in MIIM.  The qualitative measure of consideration in part is fixed by reference to the Sponsorship Agreement's defined contractual term "Mariner Revenue Share," which term includes other defined contractual terms and conditions as set forth

8

below.  The qualitative measure of consideration is the contractual condition that Hohns, to obtain Mariner's interest in MIIM, will pay Mariner "the fair market value of the Mariner Revenue Share at such time" as the Buyout Trigger occurs.

      d.     The record date at which point in time the qualitative measure is to be calculated, *i.e.*:

> ***Upon the occurrence of any Buyout Trigger***, Hohns shall have the right to purchase (the **"Buyout Option"**), in whole but not in part, Mariner's entire interest in MIIM either through the purchase of Mariner's entire interest in MIIM or through the purchase of all contracts and rights to management fees, performance fees and allocations to which MIIM is entitled, upon payment to Mariner of the fair market value of the Mariner Revenue Share ***at such time*** [as the applicable Buyout Trigger has occurred]. (Emphasis added.)

      e.     A mechanism for, after resolution of the threshold legal issue presented in this arbitration and Hohns's deemed exercise of the Buyout Option, mathematically quantifying the value of the qualitative measure of the consideration that Hohns will pay for Mariner's interest in MIIM.  The mechanism provides for one or more "expert evaluators" to perform that mathematical quantification.  If Hohns and Mariner cannot agree on one "expert evaluator," they shall each select an evaluator, and those two evaluators will choose a third evaluator.  Two of the three evaluators would need to agree on the quantification, and if such agreement could not be reached, the quantification would be an average of the three calculated values.

      f.     A preliminary commitment by the parties to negotiate in good faith toward consummation of a sale and purchase transaction concerning Mariner's interest in MIIM, which good faith obligation would last for 180 days following Hohns's exercise of his right to purchase the interest.

***The Parties' Threshold Contractual Interpretation Dispute***

28.      As noted above, the Buyout Trigger applicable to the parties' dispute is section

1(a), "the expiration of a period of sixty (60) months following the date of the first closing of the

Initial Fund."  Prior to the occurrence of the applicable Buyout Trigger, but in anticipation

thereof, Hohns, Mariner, and their representatives initiated discussions to explore the possibility

that the parties to the Sponsorship Agreement might reconstitute their business relationship

through a new contractual agreement.

29.      Part of those discussions included discussion about the possible valuation of

Mariner's interest in MIIM, and the parties have, on multiple occasions, exchanged their positions

regarding a possible valuation of that interest.  The parties have been unable to reach agreement.

The parties dispute the legal meaning of the terms in the Buyout Option Agreement and

Sponsorship Agreement that establish the qualitative component of the Buyout Option valuation.

30.      IIFC Fund I closed on December 12, 2013, and therefore the applicable Buyout

Trigger occurred on December 12, 2018 (the "Record Date").  On or about March 11, 2019, prior

to the occurrence of the expiration of the 90-day time-frame to exercise the Buyout Option, the

parties entered into an agreement tolling the 90-day period while the parties endeavored to

negotiate the terms of a potential new relationship.  In addition, the parties have stipulated and

agreed that if and when they are unable to reach agreement concerning a potential new relationship

and the tolling agreement is terminated by one of them, Hohns will have 90 days from then to

exercise the Buyout Option.

31.      Because the parties are still in negotiations and not in agreement as to the legal

meaning of the terms in the Buyout Option Agreement and Sponsorship Agreement that establish

the qualitative component of the Buyout Option valuation, the tolling agreement between them is

still in effect.  Hohns is not yet obligated to exercise the Buyout Option, and has not yet exercised

it, but intends to do so.  Accordingly, section 2 of the Buyout Option Agreement is not yet operative.

32.     A real and current dispute has crystallized between the parties concerning the contractual conditions regarding Hohns's payment in connection with the Buyout Option.  The parties disagree on what components constitute the qualitative measure of consideration that Hohns would pay for Mariner's interest in MIIM, which is a threshold question of contract interpretation that must be decided before, among other things, the measure could be quantified through the expert evaluator mechanism found in section 2 of the Buyout Option Agreement.

33.     Hohns's position is that, consistent with the parties' contractual terms and conditions, the qualitative measure of consideration to be paid for Mariner's interest in MIIM factors only assets that are actually in existence at such time as the Buyout Option Agreement's Buyout Trigger has occurred.  The measure of consideration is contractually defined and based solely on "the fair market value of the Mariner Revenue Share" earned from "Specified Funds" actually in existence and under operation "at such time" the exercise of the Buyout Trigger is deemed to have occurred.  Nothing in the parties' contracts indicates that anything more is included in the qualitative measure of consideration that would be paid for Mariner's interest in MIIM.  That measure does not also include a component of future revenue on all possible assets that Hohns might someday in the future manage through products or other ventures that might possibly be developed, based on potential commitments, goodwill, or otherwise.

34.     Mariner however, contends that, beyond the Specified Funds actually in existence at such time, the qualitative measure of consideration also contains a component of future revenue on unspecified funds that Hohns might someday in the future manage through products

or other ventures that might possibly be developed, based on potential commitments, goodwill, or otherwise.[3]

35.     The parties' differing legal interpretations has the potential to change the amount of Hohns's payment in connection with the Buyout Option by millions of dollars.

36.     The parties' controversy indisputably is one over the contractual interpretation and meaning of terms and conditions set forth in the Buyout Option Agreement and, by extension, the Sponsorship Agreement.  This dispute falls squarely within the scope of the parties' Arbitration Provision (section 7 of the Buyout Option Agreement), which is the only arbitration agreement contained in the Buyout Option Agreement.  Acting under the parties' express authority conferred by section 7, the Panel must decide the threshold legal issues of contract interpretation and meaning concerning the qualitative measure of consideration to be paid for Mariner's interest in MIIM, <u>before</u> any "expert evaluator" may mathematically quantify that interest.  That is the order of operations both contemplated and authorized by the Buyout Option Agreement.

***Hohns's Interpretation of the Qualitative Measure of Consideration to be Paid for Mariner's Interest is Correct; Mariner's Position is Unsupportable and Must be Rejected***

37.     Hohns's position on the parties' disputed legal issue is supported by reasoned rationale that will be fully explained for the Panel in the course of this arbitration.  Hohns's position is based on logical, plain-language interpretations of terms and conditions that actually are set forth in the Buyout Option Agreement, the Sponsorship Agreement, and the Employment

---

[3] Section 7(d) of the IIFC II-A GP, LLC Agreement reflects the parties' agreement that Fund IIFC II-A will not be factored in calculating "the fair market value of Mariner Revenue Share at such time" of the Buyout Trigger, when the Buyout Option is exercised, assuming the Panel accepts Hohns's contractual interpretation.

Agreement.  Hohns's position considers all of these contracts together, gives reasonable and consonant meaning to all of their terms, and does not urge meanings of certain terms that conflict with other provisions or render other provisions superfluous.

38.     Nothing in the plain language of section 2 of the Buyout Option Agreement—the Buyout Option provision—even remotely suggests that Mariner has any interest in speculative revenues of future unspecified funds or businesses.  To the contrary, the plain language of section 2 expressly requires measuring "the fair market value of the Mariner Revenue Share at such time" the Buyout Option is deemed exercised.  The parties used the language "at such time" to anchor measurement of value of the Mariner Revenue Share to assets then in existence and under management at the point in time at which the Buyout Trigger occurred.  The applicable Buyout Trigger confers the right to exercise the Buyout Option at the point in time of 60 months following the date of the first closing of the Initial Fund, *i.e.*, December 12, 2018.

39.     This 60-month Buyout Trigger gives Hohns only a temporally-fixed right to exercise the Buyout Option (90 days from that point in time, plus the additional time now added by virtue of the parties' tolling agreement).  Nothing in the parties' agreement supports Mariner's suggestion that it has, effectively, a continuing monetary interest in future revenues earned on future unspecified funds after the Buyout.  But that is Mariner's interpretation, and it strips all meaning from the bargained-for 60-month period.  Indeed, no 60-month Buyout Trigger period—or any length of time—would be needed in the contract if Mariner were entitled to the fair market value of future business at any point in time.

40.     Likewise, the definition of "Mariner Revenue Share" that is the keystone in the measure of consideration Mariner would receive for its interest in MIIM is not susceptible to any interpretation that could give Mariner, as part of the Buyout, an interest in revenues on assets that

might come into existence and be managed by Hohns in the future.  "Mariner Revenue Share" is a defined term in the Sponsorship Agreement used to *circumscribe* Mariner's compensatory interest in MIIM.  Mariner's attempt to now *expand* its interest in MIIM directly conflicts with the plain language used in the defined term.  The definition of "Mariner Revenue Share" explicitly provides that Mariner's compensation—and thus ultimately its interest in MIIM pursuant to section 2 of the Buyout Option Agreement—is pegged to certain monies actually received by Mariner for each "such" Specified Fund actually in existence and actually operated in a given year.  *See* Ex. B at p. 2.  The Sponsorship Agreement defines "Mariner Revenue Share" as follows:

> **"Mariner Revenue Share"** shall mean, <u>for each year</u> and <u>for *each* Specified Fund</u>, an amount equal to the difference of (a) thirty-three percent (33%) of the Net Manager Revenue <u>*actually* received by</u> Mariner or its affiliates (or by other Persons designated by Mariner), including MIIM, in connection with <u>*such* Specified Fund</u>, less (b) the amount of performance fees and allocations <u>received by</u> Mariner or its affiliates or designees, including MIIM, with respect to <u>*such* Specified Fund</u> in <u>*such* year</u>. (Emphasis added.)

41.     The term "Net Manager Revenue" is a contractually defined term included in the defined term "Mariner Revenue Share."  The Sponsorship Agreement defines "Net Manager Revenue" as follows:

> **"Net Manager Revenue"** shall mean, for <u>*each* year</u>, an amount equal to the sum of (a) the gross revenue <u>received by</u> MIIM, plus (b) the amount of performance fees and allocations <u>*earned in respect of* Specified Funds</u> and other products managed by MIIM <u>and paid</u> directly to Mariner (or other Persons controlled or designated by Mariner) and each applicable Specified Fund Service Provider (or other Persons controlled or designated by Hohns), minus (x) all distribution-related expenses, which expenses shall not exceed fifteen percent (15%) of the sum of: (i) the Mariner Revenue Share and (ii) the amount of performance fees and allocations <u>*earned in respect of* Specified Funds</u> and other products managed by MIIM <u>and paid</u> directly to Mariner or its designees, and (y) unless waived by Hohns and Mariner (acting together), the Annual Donation Amount. (Emphasis added.)

42.     The terms "Specified Fund" and "Specified Funds" also are contractually defined terms included in the terms "Mariner Revenue Share" and "Net Manager Revenue" (which itself

14

is included in the term "Mariner Revenue Share"), respectively.  The contract defines "Specified Fund" and "Specified Funds" as "hav[ing] the meaning set forth in Section 2(a)."  Section 2(a) of the contract provides as follows:

> *MIIM as Manager of Specified Funds and Products Implementing Credit-Related Infrastructure Investment Strategy*. Promptly upon the execution of this Agreement by the Parties, Mariner shall organize MIIM to serve as the manager of *the* funds (*each*, including the Initial Fund, *a* **"Specified Fund"**) and other products through which the Parties shall execute their credit-related infrastructure investment strategy. (Partial emphasis added.)

43.     As explained above (*see* ¶¶ 20, 21), only three Specified Funds had ever been formed and operated under the Sponsorship Agreement at the time the applicable Buyout Trigger occurred:  Fund I, Fund II, and the Breakwater Fund.[4]  In fact, the compensation formula specified by the definition of "Mariner Revenue Share" has, consistent with the contract, only been applied to these particular Specified Funds over the years, and has never included a factor for future revenues that might potentially be earned by other not-yet-in-existence unspecified funds.  As such, the history of dealing among the parties reinforces the plain language and logical interpretation of the provision contained in the Buyout Option Agreement—that the fair market value of Mariner's interest in MIIM can only be calculated with reference to future earnings of the Mariner Revenue Share pertaining to Specified Funds existing and under operation at such time that the Buyout Trigger occurred.  There is, however, no support in the definitions, in logic, or in the historical dealings among the parties, for a different interpretation that would include unknown future revenues from yet-to-be-created unspecified funds that were not in existence at such time as the Buyout Trigger occurred.

---

[4] As noted above, Fund I and Fund II were the only Specified Funds actually in existence and under operation at the time the applicable Buyout Trigger occurred, and only those two funds should be considered in any valuation of Mariner's interest in MIIM.

44.     Moreover, many of the Buyout Triggers other than the 60-month time period involve bad conduct by Mariner, or actions taken by it that would negatively impact Hohns. These triggers are unilateral, *i.e.,* arising only from conduct by Mariner.  Importantly, the methodology provided for determining the price that Hohns would pay for Mariner's interest in MIIM is the same regardless of which Buyout Trigger occurs—"the fair market value of the Mariner Revenue Share at such time."  If Mariner's interpretation were correct, it would mean that the parties somehow intended to reward Mariner's bad conduct or negative actions towards Hohns, by unjustifiably giving Mariner an interest in future revenues that Hohns might earn on future unspecified funds, and forcing Hohns to essentially pay a "ransom" in order to buy out Mariner and extricate himself from the situation.  That unreasonable result was not intended by the parties and reveals the illogic of Mariner's interpretation.[5]

45.     The basis for Mariner's contractual interpretation appears to be simply because Mariner says so.  Despite repeated requests that Mariner articulate the contractual basis of its position, it has yet to do so.  So far, Hohns understands Mariner's view to be that, casting aside the meaning of actual terms that the parties' bargained for in their contracts, the ground for Mariner's position is an observation that, according to Mariner, fund manager valuations sometimes factor new assets that might be brought under management in the future.  That

---

[5] Section 7 of the Employment Agreement, "Termination of Agreement," is consistent with Hohns's position.  There, the parties did carve out an express circumstance in which Mariner would be entitled to a portion of future revenues on future unspecified funds undertaken by Hohns that would otherwise have been "Exclusive Activities" under the Sponsorship Agreement: if Hohns were to resign for "other than for Good Reason."  The parties defined a specific formula to calculate Mariner's interest in such future revenues, and it bears no relation to, and is entirely different from, the measure that defines Mariner's interest in MIIM under section 2 of the Buyout Option Agreement.  The parties knew how to provide Mariner with an interest in future revenues earned on future funds when they wanted to do so.  They used such language in section 7 of the Employment Agreement, but did not do so—intentionally—in section 2 of the Buyout Option Agreement.

observation is inapposite here.  Mariner's view finds no grounds in any part of the parties' Buyout Option Agreement, Sponsorship Agreement, or otherwise.  To the contrary, Mariner's position conflicts with the plain language and meaning of provisions in the Buyout Option Agreement and Sponsorship Agreement and is inconsistent with the Employment Agreement. Mariner's interpretation must be rejected.

## HOHNS'S CLAIM AGAINST MARINER

### (Declaratory Relief)

46.     Hohns incorporates by reference and realleges paragraphs 1 through 45 of this Demand for Arbitration as if fully set forth herein.

47.     Hohns asks the Panel to issue declaratory relief as follows:

a.      Consistent with the plain language of terms and conditions contained in binding contracts entered into between the parties, the qualitative measure of consideration to be paid for Mariner's interest in MIIM is contractually defined and based solely on "the fair market value of the Mariner Revenue Share," earned only from revenues on "Specified Funds" that are actually in existence and under management "at such time" as the Buyout Option Agreement's Buyout Trigger has occurred.

b.      Accordingly, only revenues earned on Fund I and Fund II should be factored in the calculation of "the fair market value of Mariner Revenue Share at such time" that governs the provisions related to Hohns's intended exercise of the Buyout Option.

48.     Rule 24(c) of the currently-operative JAMS Comprehensive Arbitration Rules and Procedures provides that:

> In determining the merits of the dispute, the Arbitrator shall be guided by the rules of law agreed upon by the Parties. In the absence of such agreement, the Arbitrator shall be guided by the rules of law and equity that he or she deems to be most appropriate. The Arbitrator may grant any remedy or relief that is just and equitable and within the scope of the Parties' agreement, including, but not limited to, specific performance of a contract or any other equitable or legal remedy.

49.     Hohns's request for declaratory relief is authorized, and is appropriate in these circumstances, pursuant to New York law, which governs this dispute.  *See* Buyout Option Agreement, § 10 ("This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York . . . .").  The parties' dispute is ripe for adjudication and is an actual, definite, concrete and substantial controversy that is justiciable and of sufficient immediacy to justify the relief sought.  The requested declaratory relief will serve a useful purpose in clarifying or settling the legal issues between the parties concerning the qualitative measure of consideration to be paid for Mariner's interest in MIIM; will finalize the controversy and offer relief from uncertainty; is not being used merely for procedural fencing or a race to *res judicata*; will not increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court; and there is no better or more effective remedy.  *See, e.g.*, *N.Y. v. Solvent Chem. Co.*, 664 F.3d 22, 26 (2d Cir. 2011).

## RELIEF REQUESTED

Based on the foregoing allegations, Petitioner Hohns respectfully requests that the Panel issue a written and reasoned opinion and order declaring as follows:

> Consistent with the plain language of terms and conditions contained in binding contracts entered into between the parties, the qualitative measure of consideration to be paid for Mariner's interest in MIIM factors only projected future revenues on assets that are actually under management at such time as any of the Buyout Option Agreement's Buyout Triggers are deemed to occur.  The measure of consideration is contractually defined and based solely on "the fair market value of the Mariner Revenue Share" earned from "Specified Funds" actually in existence and under operation "at such time" as a Buyout Trigger is deemed to occur.  The qualitative

measure of consideration does not include projected future revenues associated with either (a) investments that had not yet been made and/or (b) investment funds that had not yet come into existence, in both cases at such time of any Buyout Trigger.  Accordingly, only revenues earned on Fund I and Fund II can be factored in the calculation of "the fair market value of Mariner Revenue Share at such time" as a Buyout Trigger is deemed to occur.  Contrary to Mariner's view, the qualitative measure of consideration for its interest in MIIM does not also include a component of future revenue on all possible assets that Hohns might someday in the future manage through products or other ventures that might possibly be developed, based on potential commitments, goodwill, or otherwise.

WHEREFORE, Claimant Hohns respectfully requests that this Panel enter judgment in his favor against Respondent Mariner for the requested declaration, as well as costs, attorneys' fees, and such other relief as this Panel deems just and proper.

Respectfully submitted,

MORGAN, LEWIS & BOCKIUS LLP

Dated:  September 17, 2019          By:

Brian W. Shaffer
bshaffer@morganlewis.com
Jose M. Sabalbaro
jose.sabalbaro@morganlewis.com
1701 Market Street
Philadelphia, PA 19103
215.963.5103 (phone)
215.963.5001 (fax)

John A. Vassallo, III
101 Park Avenue
New York, NY 10178-0600
212.309.6000 (phone)
212.309.6001 (fax)
john.vassallo@morganlewis.com

*Counsel for Claimants*

# **<u>Exhibit A</u>**

**EXECUTION COPY**

## MARINER-HOHNS BUYOUT OPTION AGREEMENT

This BUYOUT OPTION AGREEMENT (this "**Agreement**") is made as of the 13th day of March, 2012 by and between MARINER INVESTMENT GROUP, LLC, a limited liability company organized under the laws of Delaware ("**Mariner**") and Andrew Hohns ("**Hohns**" or "**Executive**").

<u>**W I T N E S S E T H**</u>:

WHEREAS, Mariner and Hohns are party, together with IIFC Manager and MIIM, to that certain Sponsorship Agreement, dated as of the date hereof (the "**Sponsorship Agreement**"), which sets forth certain terms regarding the formation, structure, operation and management of an infrastructure finance business;

WHEREAS, Hohns is the managing member of each Specified Fund Service Provider;

WHEREAS, Mariner is the sole member of Mariner Infrastructure Investment Management LLC, a limited liability company organized under the laws of Delaware ("**MIIM**"); and

WHEREAS, Mariner and Hohns (each, a "**Party**" and collectively, the "**Parties**") desire to set forth their agreement regarding certain key terms and conditions regarding the sale and buyout options of Hohns and Mariner.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, do hereby agree as follows:

1. <u>Defined Terms</u>. Capitalized terms used but not defined herein have the meanings assigned to them in the Sponsorship Agreement. As used in this Agreement, the following terms have the meanings specified below:

"**Buyout Trigger**" shall mean:

(a) the expiration of a period of sixty (60) months following the date of the first closing of the Initial Fund, or

(b) the occurrence of a Key Executive Change, or

(c) the termination without Cause of Hohns as President and CEO of MIIM, or

(d) the resignation with Good Reason by Hohns as President and CEO of MIIM, or

(e)     a material breach by Mariner of any of its obligations as set forth in the Sponsorship Agreement, which remains uncured for a period of sixty (60) days following the date on which written notice of the breach was provided, or

(f)     bankruptcy or insolvency of Mariner, or

(g)     each and any applicable event as described in Section 23.

"**Cause**" shall have the meaning set forth for such term in the Employment Agreement, dated as of the date hereof, among Mariner and Hohns.

"**Good Reason**" shall mean (a) a reduction by MIIM of Hohns's title, role or responsibilities, (b) a change in Hohns' reporting relationships, (c) a failure to obtain commitments for the Initial Fund of at least $100 million on or prior to the date that is twelve (12) months from the Effective Date of the Sponsorship Agreement, as defined therein (provided that the first closing of the Initial Fund has not taken place by such date), or (d) a material breach by Mariner of any obligation owed to Hohns or any Specified Fund Service Provider under the Sponsorship Agreement or any other related agreement or document, and such breach remains uncured for sixty (60) days following the date on which written notice of the breach was provided.

"**Key Executive Change**" shall mean an event in which any two of the following three executives officers of Mariner are no longer employed on a full-time basis with Mariner:  (a) Brace Young, (b) Dan Sullivan, and (c) Chip Howe.

2.     Buyout Option.  Upon the occurrence of any Buyout Trigger, Hohns shall have the right to purchase (the "**Buyout Option**"), in whole but not in part, Mariner's entire interest in MIIM, either through the purchase of Mariner's entire interest in MIIM or through the purchase of all contracts and rights to management fees, performance fees and allocations to which MIIM is entitled, upon payment to Mariner of the fair market value of the Mariner Revenue Share at such time.  Such fair market value shall be determined by an independent nationally recognized expert evaluator of investment management businesses mutually selected by the Parties, which expert shall have experience in valuing investment fund managers.  If Mariner and Hohns cannot agree on an evaluator, each shall choose an evaluator, and the two evaluators shall select a third evaluator with the foregoing qualifications, and any two of the three evaluators that agree shall decide the fair market value of the Mariner Revenue Share.  If the three evaluators do not agree, the fair market value of the Mariner Revenue Share shall be the average of the three values determined by the evaluators.  Hohns shall have ninety (90) days after the occurrence of the applicable Buyout Trigger to exercise, by written notice to Mariner, such Buyout Option.  Hohns and Mariner shall act in good faith to complete the sale and purchase transaction pursuant to the exercise of the Buyout Option within 180 days following Hohns's exercise of such Buyout Option.

3.     Capital Transactions.

(a)     _Sale by Mariner_.  Mariner shall not be entitled to sell or transfer its interest in MIIM to a third party purchaser (for purposes of this subsection only, the "**Buyer**") unless Mariner has sent the Buyer's offer in writing to Hohns (for purposes of

this subsection only, the "**Tag Along Notice**"). The Tag Along Notice shall contain the terms and conditions of such offer (including all material information provided to the Buyer). Hohns shall have a period of thirty (30) days from the date of receipt of the Tag Along Notice (for purposes of this subsection only, the "**Tag Along Response Period**") to notify Mariner of his intent to either: (i) accept the Tag Along Notice and participate in the sale to the Buyer by sale or transfer of all of his interests in the Specified Fund Service Providers to the Buyer, pursuant to the terms and conditions set forth in the Buyer's offer; or (ii) reject such Tag Along Notice and not participate in such sale; provided, however, that in the event Hohns fails to respond during the Tag Along Response Period, then such non-response shall be deemed to be a rejection of the Tag Along Notice. If Hohns rejects such Tag Along Notice, Mariner may abandon the sale to the Buyer. If Mariner does not abandon such sale, Mariner shall first offer to sell to Hohns all of its interest in MIIM in accordance with the terms of the Buyout Option. If Hohns does not accept such offer, at Mariner's election, Hohns shall sell or transfer to Mariner his interests in the Specified Fund Service Providers, in whole but not in part, in accordance with the valuation procedures set forth in the Buyout Option, applied *mutatis mutandis* to IIFC Manager.

(b)     *Sale by Hohns*.  Hohns shall not be entitled to sell or transfer his interests in the Specified Fund Service Providers to a third party purchaser (for purposes of this subsection only, the "**Buyer**") unless Hohns has sent the Buyer's offer in writing to Mariner (for purposes of this subsection only, the "**Tag Along Notice**"). The Tag Along Notice shall contain the terms and conditions of such offer (including all material information provided to the Buyer). Mariner shall have a period of thirty (30) days from the date of receipt of the Tag Along Notice (for purposes of this subsection only, the "**Tag Along Response Period**") to notify Hohns of its intent to either: (i) accept the Tag Along Notice and participate in the sale to the Buyer by sale or transfer of all of its interest in MIIM to the Buyer, pursuant to the terms and conditions set forth in the Buyer's offer; or (ii) reject such Tag Along Notice and not participate in such sale; provided, however, that in the event Mariner fails to respond during the Tag Along Response Period, then such non-response shall be deemed to be a rejection of the Tag Along Notice. If Mariner rejects such Tag Along Notice, Hohns shall either (x) abandon the sale to the Buyer or (y) exercise the Buyout Option in accordance with the terms thereunder. Notwithstanding anything to the contrary in this Section 3(b), Hohns shall be entitled to sell, assign, gift or transfer, without Mariner's or MIIM's prior approval, up to forty nine percent (49%) of his interests in the Specified Fund Service Provider to affiliates, family members, or otherwise for the purposes of Hohns' estate planning.

(c)     In the event of a proposed sale by either Mariner or Hohns in accordance with Sections 3(a) or 3(b), as applicable (each, as appropriate, the "**Selling Party**"), where the other Party elects to participate in such sale (the "**Electing Party**") in accordance with Sections 3(a) or 3(b), as applicable, the Selling Party shall use commercially reasonable efforts to obtain the agreement of the applicable Buyer to the participation of the Electing Party in such sale pursuant to the terms and conditions set forth in the Buyer's offer, and the Selling Party shall not complete the sale to such applicable Buyer if such Buyer declines to allow the participation of the Electing Party.

4.     Notices.   Any notice, consent, request or other communication made or given in accordance with this Agreement shall be in writing and shall be deemed to have been duly given on the earlier of (a) the day when actually received by mail, and (b) three (3) days after mailing by registered or certified mail, return receipt requested, to those person's listed below at their respective addresses listed below or at such other address or person's attention as each Party may specify by notice to each of the other Parties in accordance with the provisions of this Section 4.  With respect to any notice, consent, request or other communication made or given in accordance with this Section 4, where possible an electronic mail copy shall also be provided (although the provision of said copy does not relieve the obligation to provide formal notice by mail):

If to Mariner:

500 Mamaroneck Avenue
Harrison, New York 10528
Attention: Peter J. O'Rourke
Email:  peter@marinercapital.com

If to Andrew Hohns:

231 Spruce St.
Philadelphia, PA 19106
Email:  andrewhohns@gmail.com

5.     Complete Understanding; Amendment; Waiver.  This Agreement, together with the Sponsorship Agreement, constitutes the complete understanding between the Parties with respect to the subject matter contemplated herein, and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, and no statement, representation, warranty or covenant has been made by any Party with respect thereto except as expressly set forth herein.  This Agreement shall not be altered, modified, amended or terminated except by a written instrument signed by both Parties.  Any waiver of any term or provision hereof, or of the application of any such term or provision to any circumstances, shall be in writing signed by the Party charged with giving such waiver.  Waiver by either Party of any breach hereunder by the other Party shall not operate as a waiver of any other breach, whether similar to or different from the breach waived.  No delay on the part of either Party in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by either Party of any such right or remedy shall preclude other or further exercise thereof.

6.     Remedies; Enforcement.   The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Notwithstanding anything to the contrary contained herein or in any other related agreement or document, each of the Parties shall have the authority to enforce rights and remedies hereunder and under the other related agreements and documents against the other Party in breach of its respective representations and obligations set forth herein and therein.

7.    <u>Arbitration</u>.  Any controversy or dispute between the parties arising out of any of the terms or conditions of this Agreement shall be submitted to an independent professional arbitration association in New York.   Any arbitrator(s) selected must have significant arbitration experience relating to the securities industry.  The Parties shall select an arbitrator by mutual agreement within thirty (30) days of the date of the demand for arbitration. If the Parties are unable to agree on the selection of an arbitrator within such time, each Party shall select an arbitrator and the two arbitrators shall select a third arbitrator.  Any of the two of the three arbitrators that agree shall decide the matter.  The cost of the arbitration shall be borne equally by the Parties, unless the arbitrator(s) order otherwise.  The arbitration shall be binding with no right of appeal.

8.    <u>Severability</u>.  If any provision of this Agreement or the application of any such provision to any Party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law.  If the final judgment of a court of competent jurisdiction declares that any provision of this Agreement, is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power, and is hereby directed, to reduce the scope, duration or area of the provision, to delete specific words or phrases and to replace any invalid or unenforceable provision with a provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable provision, and this Agreement shall be enforceable as so modified.

9.    <u>Survivability</u>.  The provisions of this Agreement which by their terms call for performance subsequent to termination of this Agreement, shall so survive such termination.

10.    <u>Governing Law; Consent to Jurisdiction</u>.   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed within that State, without regard to its conflict of laws provisions.

11.    <u>Counterparts</u>.   This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

12.    <u>Headings</u>.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

*[Signature Page Follows.]*

**IN WITNESS WHEREOF**, each of the Parties has duly executed this Agreement as of the date first above written.

MARINER INVESTMENT GROUP, LLC

By: _____

Name: Peter O'Rourke

Title: General Counsel

ANDREW HOHNS

_____

Andrew Hohns

[Signature Page to Mariner-Hohns Buyout Option Agreement]

# **Exhibit B**

EXECUTION COPY

## SPONSORSHIP AGREEMENT

This SPONSORSHIP AGREEMENT (this "**Agreement**") is made as of the 13th day of March, 2012 by and between MARINER INVESTMENT GROUP, LLC, a limited liability company organized under the laws of Delaware ("**Mariner**"), MARINER INFRASTRUCTURE INVESTMENT MANAGEMENT LLC, a limited liability company organized under the laws of Delaware ("**MIIM**"), Andrew Hohns ("**Hohns**"), and each Specified Fund Service Provider (defined below) as may be designated pursuant to the establishment of Specified Funds (defined below) from time to time in accordance with Section 2(a).

### W I T N E S S E T H :

WHEREAS, Mariner is the sole member of MIIM;

WHEREAS, Hohns is the managing member of IIFC Manager (defined below);

WHEREAS, Mariner and Hohns intend to jointly establish an infrastructure finance business through which Mariner and Hohns (and MIIM and the Specified Fund Service Provider (defined below), entities established by them, respectively) shall conduct their infrastructure related investment activities;

WHEREAS, Mariner, MIIM, Hohns and each Specified Fund Service Provider (defined below) from time to time party hereto (each a "**Party**" and collectively, the "**Parties**") desire to set forth their agreement regarding the formation, structure, operations and management of such infrastructure finance business;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, do hereby agree as follows:

1.    Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"**Annual Donation Amount**" shall mean, for each year, five percent (5%) of the total management fees received by MIIM in connection with the Specified Funds and other products under its management in such year.  For the avoidance of doubt, the "Annual Donation Amount" does not include any portion of performance fees and allocations relating to any Specified Fund.

"**Commencement Date**" shall mean December 1, 2011.

"**Effective Date**" shall have the meaning set forth in Section 4(a).

"**Employment Agreements**" shall mean (a) the Employment Agreement dated as of March 13, 2012 between Mariner and Hohns, substantially in the form of Exhibit A hereto, and (b) each additional Employment Agreement dated as of March 13, 2012

between Mariner and each of Aaron Barnes and Molly Whitehouse, respectively, and each additional employee who shall be a member of the MIIM credit committee or whom Hohns shall otherwise determine shall enter into such Employment Agreement, substantially in the form of Exhibit B hereto.

"**Exclusive Activities**" shall mean any infrastructure investment activities relating to platforms or vehicles established subsequent to December 2011 by Mariner or Hohns with a primary investment strategy of investment in project finance or other infrastructure-related credit assets; provided, however, an "Exclusive Activity" shall not include any activity where (a) Mariner and Hohns agree in good faith that one such Party lacks the talent required to skillfully execute such activity, and such Party is unable to cure the identified deficiency within a reasonable period of time, or (b) either Mariner or Hohns wishes to pursue the activity, and the other Party does not (it being understood that at such time as the other Party indicates it does not wish to pursue such activity, the Party wishing to pursue such activity may do so independently, and such activity shall no longer be an Exclusive Activity).

"**Good Reason**" shall have the meaning set forth in Section 4(d)(i).

"**IIFC Manager**" shall mean IIFC Management LLC, a limited liability company organized under the laws of Delaware.

"**Initial Fund**" shall have the meaning set forth in Section 3(a).

"**Manager Earnings**" shall mean, with respect to each Specified Fund, for each year, the net earnings of MIIM, after payment of all expenses listed on Schedule A hereto and payment of the Mariner Revenue Share, but without deduction for any expenses of MIIM for which Mariner is responsible as set forth in Section 6.

"**Mariner Revenue Share**" shall mean, for each year and for each Specified Fund, an amount equal to the difference of (a) thirty-three percent (33%) of the Net Manager Revenue actually received by Mariner or its affiliates (or by other Persons designated by Mariner), including MIIM, in connection with such Specified Fund, *less* (b) the amount of performance fees and allocations received by Mariner or its affiliates or designees, including MIIM, with respect to such Specified Fund in such year.

"**MIIM Board of Directors**" shall have the meaning set forth in Section 2(d).

"**Net Manager Revenue**" shall mean, for each year, an amount equal to the sum of (a) the gross revenue received by MIIM, plus (b) the amount of performance fees and allocations earned in respect of Specified Funds and other products managed by MIIM and paid directly to Mariner (or other Persons controlled or designated by Mariner) and each applicable Specified Fund Service Provider (or other Persons controlled or designated by Hohns), minus (x) all distribution-related expenses, which expenses shall not exceed fifteen percent (15%) of the sum of: (i) the Mariner Revenue Share and (ii) the amount of performance fees and allocations earned in respect of Specified Funds and other products managed by MIIM and paid directly to Mariner or its designees, and (y) unless waived by Hohns and Mariner (acting together), the Annual Donation Amount.

"**Person**" shall mean any individual, partnership, joint venture, limited liability company, corporation, trust or other entity, any governmental entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so requires.

"**Post-Termination Mariner Revenue Share**" shall mean 28%.

"**Pre-funding Budget**" shall mean the budget approved by Mariner and Hohns with respect to the period prior to the first closing of the Initial Fund, as set forth in Schedule B hereto.

"**Services Agreement**" shall have the meaning set forth in Section 8(a).

"**Specified Fund**" or "**Specified Funds**" shall have the meaning set forth in Section 2(a). For the avoidance of doubt, "Specified Funds" shall include the Initial Fund.

"**Specified Fund Service Provider**" shall mean (a) with respect to the Initial Fund, IIFC Manager, and (b) with respect to any other Specified Fund, the entity designated as the "Specified Fund Service Provider" with respect to such Specified Fund in the related Sponsorship Agreement Supplement.

"**Sponsorship Agreement Supplement**" shall mean each Sponsorship Agreement Supplement, by and between Mariner, MIIM, Hohns and the related Specified Fund Service Provider, substantially in the form of Exhibit C hereto.

"**Transaction Documents**" shall mean this Agreement, each Sponsorship Agreement Supplement, each Services Agreement and each Employment Agreement.

"**Working Capital Commitment**" shall have the meaning set forth in Section 5.

2.      Formation and Management of MIIM.

(a)      *MIIM as Manager of Specified Funds and Products Implementing Credit-Related Infrastructure Investment Strategy.* Promptly upon the execution of this Agreement by the Parties, Mariner shall organize MIIM to serve as the manager of the funds (each, including the Initial Fund, a "**Specified Fund**") and other products through which the Parties shall execute their credit-related infrastructure investment strategy.

(b)      *Exclusive Activities.* Except as otherwise agreed between Mariner and Hohns, all Exclusive Activities of Mariner and/or Hohns shall be conducted through MIIM and a Specified Fund Service Provider, or another entity owned and controlled by Mariner and Hohns, on substantially the same terms as set forth herein.

(c)      *Hohns as President and CEO of MIIM.* Hohns shall act as President and Chief Executive Officer of MIIM, and in such capacities, shall:

(i)        report to the MIIM Board of Directors,

(ii)        be responsible for the management of MIIM's day-to-day activities, and

(iii)        devote such time to the activities of MIIM as is reasonably necessary for the prudent management of MIIM.

(d)        *MIIM Board of Directors.* Brace Young and Hohns will serve as members of MIIM's board of directors (the "**MIIM Board of Directors**"). Mariner shall appoint two (2) additional members, and Hohns shall appoint one (1) additional member to the MIIM Board of Directors.

(e)        *MIIM Budget.* Subject to the Working Capital Commitment and except in respect of the items listed in the Pre-funding Budget, Mariner shall have approval rights over the annual budget of MIIM, including any portion thereof, for any period in which the payment of 100% of the sum of the Mariner Revenue Share *plus* the expenses of MIIM set forth in Schedule A, would result in an after-tax loss for MIIM. In any year in which (a) any portion of Mariner's Working Capital Commitment remains outstanding, and (b) the expenses of MIIM set forth in Schedule A exceed the cash available from management fees for the payment thereof, amounts from the performance fees and allocations owned by, and to be paid to, Mariner and each Specified Fund Service Provider, or their respective designees, shall first be applied to cover such excess. Otherwise, the performance fees and allocations owned by, and to be paid to, each Specified Fund Service Provider shall first be applied to cover any such excess.

3.    Specified Funds.

(a)        *Initial Fund.* MIIM will proceed diligently to establish the International Infrastructure Finance Company Fund (the "**Initial Fund**"), which will operate as a specialty finance vehicle to enhance the credit rating on selected project finance and infrastructure related debt securities and portfolios thereof or to engage in other infrastructure-related investment or credit-enhancement activities.

(b)        *Mariner as Sponsor of Initial Fund, Marketing Agent and Investor in Initial Fund.* Mariner shall sponsor the Initial Fund, act as its exclusive marketing agent and invest up to $5 million in Specified Fund interests at the first closing of the Initial Fund.

(c)        *Organizational Expenses of Initial Fund.* The organizational expenses of the Initial Fund shall be borne by the Initial Fund. Notwithstanding the foregoing, the Working Capital Commitment may be used in part to off-set initial organizational expenses prior to the first closing of the Initial Fund.

(d)        *Additional Specified Funds.* With the consent of Mariner and Hohns, additional Specified Funds and other products may be offered by MIIM

- 4 -

from time to time.  Mariner shall sponsor such Specified Funds and other products and serve as exclusive marketing agent.  Unless otherwise agreed by Mariner and Hohns, Hohns shall participate in such additional Specified Funds and other products in accordance with the terms set forth herein.  For the avoidance of doubt, such participation by Hohns shall be on substantially the same economic and structural terms as set forth herein, including an agreement substantially similar to the Services Agreement, which may be with a Specified Fund Service Provider or another entity controlled by Hohns.

4.     <u>Employees</u>.

(a)     *Timing*.  Except as set forth herein, Hohns and Molly Whitehouse shall become employees of Mariner on the date on which the following conditions have been satisfied (the "**Effective Date**"):  (i) the execution of this Agreement by the Parties hereto and (ii) the execution by Hohns and Mariner of an Employment Agreement substantially in the form of <u>Exhibit A</u> hereto and the execution by Molly Whitehouse of an Employment Agreement substantially in the form of <u>Exhibit B</u> hereto. With respect only to Hohns, Aaron Barnes, and Molly Whitehouse, at the start-date of their respective employment, each shall be paid a sign-on bonus in an amount equal to the amount they would have received by such start-date had such employment in fact commenced on the Commencement Date.  All such employees will be eligible for the employee benefit package that all Mariner employees receive.

(i)     In respect of Aaron Barnes, the Parties confirm that he became an employee of Mariner upon the execution of the Employment Agreement in the form of <u>Exhibit B</u> hereto.

(b)     *Additional Employees*.  Hohns may hire additional employees for Mariner, <u>provided</u> that, with respect to each prospective additional employee: (i) Mariner is satisfied with background and regulatory checks for such prospective additional employee, and (ii) either (A) the costs of such prospective additional employee are covered in the annual budget then in effect or (B) Mariner provides its consent, such consent not to be unreasonably withheld, if the costs for such prospective additional employee would not reduce the Mariner Revenue Share or cause MIIM to have an after-tax loss for the year of such employment.

(c)     *Consultancy Agreements*.  Additionally, upon the Effective Date, MIIM shall retain the consultancy services of up to three (3) consultants previously identified by Hohns to Mariner in writing (each of whom MIIM expects to hire as an employee of MIIM upon the completion of the first closing of the Initial Fund and each of whom shall sign a non-disclosure agreement in a form approved by Hohns prior to commencing his or her role as a consultant to MIIM).  The Pre-funding Budget will include an aggregate allowance of $7,500 per quarter for the consultancy services referenced in this Section 4(c).

(d)     *Termination.*

(i)     Hohns may resign as an employee of Mariner at any time upon ninety (90) days notice to Mariner; provided, however, that if Hohns resigns other than for Good Reason (as defined below),  Mariner shall be entitled to receive (subject to the terms and conditions set forth herein) from any venture undertaken by Hohns that engages in any Exclusive Activities, an amount equal to the product of: (A) the Post-Termination Mariner Revenue Share, *multiplied by* (B) Hohns's earnings from such venture, but only during such periods that Hohns, directly or indirectly, holds more than twenty-five percent (25%) (in the aggregate, if relevant) of the voting equity or economic interests in the corporate entity conducting such venture.  Hohns shall be deemed to resign with "**Good Reason**" if he resigns in connection with (w) a reduction by MIIM of his title, role or responsibilities, (x) a change in his reporting relationships, (y) a failure to obtain commitments for the Initial Fund of at least $100 million on or prior to the date that is twelve (12) months from the Effective Date (provided that the first closing of the Initial Fund has not taken place by such date), or (z) a material breach by Mariner of any obligation owed to Hohns or any Specified Fund Service Provider under this Agreement or any other related agreement or document, and such breach remains uncured for sixty (60) days after written notice of the breach has been received.

(ii)     Hohns shall obtain Mariner's consent to terminate the employment of any employee serving on MIIM's credit committee, such consent not to be unreasonably withheld.

5.     Working Capital Commitment.  Mariner shall advance to up to $1,500,000 (plus employment benefits) to MIIM to provide working capital to the business (the "**Working Capital Commitment**") during the period before the first closing of the Initial Fund and its achievement of financial self-sufficiency.  Such working capital will be provided upon demand by MIIM, provided, however, that the incurrence of any individual expenditure above $10,000 shall require the prior agreement of Mariner and Hohns (except for any previously agreed-upon fixed compensation and for any other expenditures reflected  in the Pre-funding Budget).  Such working capital shall be used to fund expenses incurred by MIIM and listed on Schedule A in connection with its management of the investment strategy, including the salaries of the employees and consultants described in Section 4.  The Parties acknowledge that the sizing of the Working Capital Commitment has been calculated on the assumption that the first closing of the Initial Fund will take place no later than the date that is twelve (12) months from the Effective Date.  On or prior to the date that is ten (10) months from the Effective Date, the Parties shall meet to discuss whether the first closing will be delayed.  If it appears at such time that the first closing will be delayed, Mariner and Hohns will discuss in good faith an increase to the Working Capital Commitment (without increase to the Mariner Revenue Share) to reflect the additional period beyond the date that is twelve (12) months from the Effective Date for which funding is required, subject to the right of any Party to terminate this Agreement as provided in Section 15.  Amounts advanced and outstanding under the Working Capital Commitment shall be repaid from Net Manager Revenue, before Mariner or its designees receives any Mariner Revenue Share or Hohns or his designees receives any Manager Earnings with respect to the

Initial Fund; it being understood that Mariner shall have no recourse to Hohns in his personal capacity for the repayment of any such unreimbursed amounts.

6. <u>Mariner Obligations</u>.  In respect of any Specified Fund or other product that is an Exclusive Activity, Mariner shall provide the following services, at its own cost (except to the extent such cost is specifically set out on <u>Schedule A</u> hereto as a cost for which the applicable Specified Fund Service Provider is responsible, or to the extent that such cost is borne by MIIM sponsored funds as contemplated in Section 13 of this agreement):

(a)  perform risk management and analysis upon such Specified Fund or other product;

(b)  perform all internal accounting, human resources, information technology (as set forth in <u>Schedule A</u>) and all other back office functions for MIIM,  and, for such Specified Fund or other product subject to Section 13 of this agreement;

(c)  provide meeting space for use from time to time in any Mariner location, and provide on a permanent basis trading desk space in Mariner's New York City office for up to two (2) employees and/or consultants dedicated to the Specified Funds;

(d)  provide compliance services required by MIIM with all United States federal regulatory and other applicable law;

(e)  assist MIIM with the development of investor correspondence and marketing material;

(f)  develop and execute a marketing strategy to complete the first closing of the Initial Fund, and subsequent closings, including the coordination of investor meetings and subsequent follow up, and post-fundraising investor relations; and

(g)  develop and execute a marketing and fundraising strategy in connection with Specified Funds beyond the Initial Fund.

7. <u>Application of Revenue</u>.

(a)  *Expenses of MIIM Paid First*.  The expenses of MIIM shall be paid or provided for in the ordinary course of business before Mariner receives any Mariner Revenue Share from MIIM or any Specified Fund Service Provider receives any Manager Earnings fees from MIIM.

(b)  *Management Fees*.  All management fees earned on funds and products managed by MIIM shall be payable to MIIM and shall be allocated by MIIM as set out in this <u>Section 7</u>.

(c)     *Performance Fees*.  All performance fees and allocations earned on Specified Funds shall be owned by and paid annually 33% to Mariner and 67% to the Specified Fund Service Provider relating to such Specified Fund, or such other entity controlled and designated by Hohns.

(d)     *Mariner Revenue Share*.  For each Specified Fund, Mariner shall receive from MIIM the Mariner Revenue Share, which shall be payable quarterly.

(e)     *Manager Earnings*.  For each Specified Fund, at the end of each quarter following the completion of required accounting work, the Specified Fund Service Provider of such Specified Fund shall receive as a non-advisory service fee 100% of the Manager Earnings in connection with such Specified Fund in such quarter.  Manager Earnings, for this purpose, shall be reduced for such quarterly period by (a) an accrual for annual compensation to be paid in subsequent periods, and (b) an accrual for anticipated non-compensation expenses to be paid in subsequent periods, in each case, mutually agreed as between Mariner and Hohns.

(f)     *Responsibility for Tax Liabilities*.  Each Party will be responsible for paying and reporting their own tax liabilities, or ratable portion thereof, including state and local taxes, if applicable.

(g)     *Right to Redistribute Entitlements*.  Each of Mariner and each Specified Fund Service Provider shall be entitled to redistribute their Mariner Revenue Share and Manager Earnings entitlements, respectively, to employees or other parties, but shall not reduce one another's entitlement without such other Party's consent.

(h)     *Payments for Which Mariner is Responsible*.

(i)     Mariner agrees that it shall be solely responsible for compensation, if any, due to Michael Barnes and/or Tricadia.

(ii)     Except as provided with respect to distribution-related expenses, Mariner shall not be entitled to reimbursement for any other costs for which Mariner is responsible (as set out in <u>Section 6</u>), which costs are intended to be compensated as part of the allocation of the Mariner Revenue Share.

(iii)     If an LP investor should become entitled to receive a share of the economics of MIIM in respect of its management revenues for any Specified Fund (e.g., a share of the Net Manager Revenue by reason of its LP investment in connection with such Specified Fund), Mariner shall be solely responsible for redistributing a portion of its Mariner Revenue Share entitlement relating to such Specified Fund to such LP investor, as a result leaving the Manager Earnings entitlement relating to such Specified Fund undisturbed.

(i)     *Payments for Which Hohns is Responsible.* Hohns agrees that he shall be solely responsible for compensation, if any, due to Institutional Financial Markets, Inc.

(j)     *Mariner Entitlement to Repayment of Advances.*  Any amounts advanced by Mariner to MIIM to pay the expenses listed on Schedule A, including amounts advanced as working capital, shall be recouped by Mariner prior to the distribution of revenue to any other holder of an interest in MIIM. Mariner's recourse as regards such amounts, where unreimbursed, shall not be to Hohns in his personal capacity.

8.     Services Agreement.  With respect to each Specified Fund:

(a)     the related Specified Fund Service Provider (or such other entity as may be agreed by Hohns and Mariner from time to time) shall enter into a non-advisory services agreement (the "**Services Agreement**") with MIIM, in connection with which MIIM management and performance fee revenues to which each Specified Fund Service Provider is entitled shall be paid, as set forth herein.

(b)     the related Specified Fund Service Provider's entitlement to its respective fee under the Services Agreement shall rank above all other Mariner creditors, except (a) Mariner as creditor in connection with the Working Capital Commitment, and (b) MIIM creditors who become such by mutual agreement of Mariner and Hohns.  Mariner shall not directly or indirectly subject any of the assets, revenues or earnings of MIIM to which Mariner is not entitled to any liens or other encumbrances by creditors of Mariner, except as specifically permitted herein.

9.     Material Adverse Effect; Bankruptcy or Insolvency.

(a)     If, in the good-faith determination of Mariner, an adverse event occurs with respect to Mariner that may have a material adverse effect on MIIM, or any material legal, regulatory or governmental action is taken with respect to Mariner, or one of its affiliates, that may have a material adverse effect on MIIM, Mariner and Hohns shall, together, take such steps as they agree necessary for the purpose of preserving the assets and value of MIIM, which may include taking reasonable steps to assist MIIM in becoming its own registered investment adviser.

(b)     Upon the bankruptcy or insolvency of MIIM, Mariner or any material subsidiary, each of the revenue agreements between MIIM and the Specified Funds and other products it manages shall automatically be assigned respectively to the Specified Fund Service Provider relating to such Specified Fund (or such other entity designated by Hohns).  Mariner's entitlement to Net Manager Revenues, including the Mariner Revenue Share, shall, in the event of such assignment, remain undisturbed and be preserved as necessary at the

entit(ies) to which the assignments are made, <u>provided</u> that Mariner continues on its own to perform, or secures at its own expense a third party to perform, without interruption, its obligations under <u>Sections 5</u> and <u>6</u> and otherwise as set forth in this Agreement.

10.     <u>Regulatory Issues</u>.

    (a)     Mariner hereby represents that it is a registered investment adviser with the United States Security and Exchange Commission ("**SEC**") and that it has determined that MIIM does not require a separate SEC investment advisor registration.  Mariner agrees to obtain and keep current (to the extent required by applicable regulations) any other registrations required from time to time for MIIM to carry out the business plan, including the CPO/CTA designations.

    (b)     Each Specified Fund Service Provider hereby represents that it is not registered with the SEC as an investment adviser, and until it is so registered, it shall not provide services of the type that would cause such Specified Fund Service Provider to become an "investment adviser" within the meaning of the Investment Advisers Act of 1940.

    (c)     Mariner and Hohns agree to review and discuss the status of any FINRA regulatory licenses held by Hohns and any other employees of Mariner involved in MIIM-related activities in January 2013, and Mariner agrees to register such licenses at a subsidiary broker-dealer, <u>provided</u> such registration by Mariner would not cause Mariner to incur a material cost or material regulatory burden.

    (d)     At the close of a sale and purchase transaction under the Buyout Option Agreement, dated as of the date hereof, by and between Mariner and Hohns, Mariner shall, at the reasonable expense of the Specified Fund Service Providers (divided *pro rata*), take reasonable steps necessary to assist MIIM in becoming its own registered investment adviser, and Mariner shall thereafter cease to provide services to the Specified Fund Service Providers unless otherwise agreed by the Parties.

11.     <u>Intellectual Property; Track Record</u>.

    (a)     With respect to each Specified Fund, to the extent that the related Specified Fund Service Provider and/or Hohns develop, or modify any Intellectual Property (as defined below), utilized for the purpose of managing such Specified Fund or any private investment entity or account, during the term of this Agreement, such Intellectual Property shall be deemed to be the property of MIIM.  To the extent such Specified Fund Service Provider and/or Hohns developed Intellectual Property prior to executing this Agreement, such Intellectual Property shall remain the property of such Specified Fund Service Provider and/or Hohns, as applicable, and, with respect to such Intellectual Property only, MIIM is hereby granted a perpetual, non-exclusive license to use

- 10 -

such Intellectual Property for purposes of providing investment management services or advice relating to each Specified Fund, regardless of termination of this Agreement.  As used in this Agreement, **"Intellectual Property"** means trademarks, copyrights, patents now or hereafter owned and trade secrets including, without limitation, formulas, patterns, compilations, programs, devices, methods, techniques, processes, designs, drawings, renderings, strategies, concepts, algorithms, models, databases, systems, technical know-how, operating instructions, marketing plans, product specifications, employee manuals and lists of actual or potential customers or suppliers.  Mariner and MIIM shall maintain the confidentiality of the Intellectual Property in accordance with Section 12 and shall have no rights to the Intellectual Property except as set forth herein.

(b)     MIIM shall own the track record of MIIM (the **"Track Record"**).  In the event the employment and/or business relationship between MIIM and Hohns is terminated, Hohns shall have the right to use the Track Record, provided Hohns is in compliance with all other terms of this Agreement and any other agreements between Hohns and MIIM, and MIIM shall provide information requested by Hohns to support the Track Record.

12.    Confidentiality.  The Parties acknowledge and agree that during the term of this Agreement, each Party will acquire Confidential Information (defined below) regarding the business of each other Party, and that such Confidential Information is a special, valuable, and unique asset of such Party.  **"Confidential Information"** shall be defined as knowledge or information of a confidential or secret nature with respect to the business affairs of any Party, including, but not limited to, any information relating to product development, marketing, and business and trading strategies, projections, strategic planning, licensing arrangements, customers, clients, investors, and pricing and financial information.  Each of the Parties agrees that it or he shall not at any time use, divulge, furnish, or make accessible to anyone (other than in the regular course of business with the other Parties) any Confidential Information; provided, however, that each Party may disclose Confidential Information of any other Party (a) as required by law, regulation, or court or governmental order or request, (b) on a confidential basis to its lawyers, accountants, or other professional advisers, or (c) that has become public otherwise than by reason of a breach of this Section 12 by the disclosing Party.

13.    Back Office and Administrative Services.  Mariner shall provide back office and administrative services to MIIM sponsored funds, which shall be an expense to MIIM sponsored funds at a rate of fifteen (15) basis points multiplied by the NAV of such sponsored funds, calculated and payable for the applicable period.  Mariner's obligation to provide such services to MIIM shall terminate one (1) year following the date on which MIIM is no longer a majority owned subsidiary of Mariner.  At the later of (a) the date on which Mariner's Working Capital Commitment is fully repaid, and (b) 18 months following the first close of the Initial Fund, Mariner and Hohns acting together and in good faith will determine whether Back Office and Administrative Services substantially similar in quality are available from third parties at a materially reduced price.  If such services are so available, Mariner shall have the option of matching such price and continuing to provide such services.  If Mariner does not elect this option, Mariner shall transfer responsibility for such services to such third parties, after which Mariner will have no further responsibility for providing such services, and will charge to the

sponsored funds only its reasonable costs associated with supervising the arms-length service providers.

14.    Use of Name.  No Party shall have the right to use in any way the name of any other Party or any of its respective affiliates, or any abbreviation or modification thereof, except in respect of the undertakings contemplated herein and otherwise with the consent of that Party.  The name of each Specified Fund shall be the jointly-owned property of MIIM and the Specified Fund Service Provider.

15.    Exculpation; Indemnification.

(a)    None of the Parties shall be liable for any loss or expense sustained by any Specified Fund (including, without limitation, any judgment settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding) by reason of any action or inaction of a Party on behalf of any Specified Fund, provided that such loss or expense did not result from the fraud, gross negligence, willful malfeasance or bad faith of such Party.

(b)    With respect to each Specified Fund, to the fullest extent permitted by law, the Parties (and each of their employees, directors, affiliates and agents) (each an "**Indemnified Party**") shall be indemnified by and held harmless by such Specified Fund for any loss or expense suffered or sustained by an Indemnified Party by reason of the fact that he or it is or was an Indemnified Party, including, without limitation, any judgment, settlement, reasonable attorneys' fees and other costs or expenses incurred in connection with the defense of any actual or threatened action or proceeding, provided that such losses did not result from the fraud, gross negligence, willful misfeasance or bad faith of such Indemnified Party.

16.    Termination.  In the event that the Initial Fund does not obtain funding commitments for at least $100 million on or prior to the date that is twelve (12) months from the Effective Date, Mariner or Hohns may unilaterally terminate this Agreement on or after such date, provided that such failure to obtain funding commitments is continuing as of the date of such termination.  Upon the first closing of the Initial Fund, no Party shall have the right to terminate this Agreement without the consent of each of the other Parties.

17.    Materials; Return at Termination.  Each of the Parties hereby agrees to deliver to any other Party promptly upon the termination of this Agreement (for any reason) all memoranda, notes, records, reports, computer programs, databases, other electronic records, and all other documents (and all copies thereof including any form of physical or electronic preservation of records) relating to the Intellectual Property of such other Party or otherwise relating to the activities of such other Party pursuant to the terms of the Transaction Documents; provided, however, that each Party is permitted to keep any records necessary for compliance with applicable law and regulations.

18.   Notices.   Any notice, consent, request or other communication made or given in accordance with this Agreement shall be in writing and shall be deemed to have been duly given on the earlier of (a) the day when actually received by mail, and (b) three (3) days after mailing by registered or certified mail, return receipt requested, to those persons listed below at their respective addresses listed below or at such other address or person's attention as each Party may specify by notice to each of the other Parties in accordance with the provisions of this Section 17.   With respect to any notice, consent, request or other communication made or given in accordance with this Section 17, where possible an electronic mail copy shall also be provided (although the provision of said copy does not relieve the obligation to provide formal notice by mail).

If to Mariner:

500 Mamaroneck Avenue
Harrison, New York 10528
Attention: Peter J. O'Rourke
Email:  peter@marinercapital.com

If to MIIM:

c/o Mariner Investment Group, LLC
500 Mamaroneck Avenue
Harrison, New York 10528
Attention: Peter J .O'Rourke
Email:  peter@marinercapital.com

With a copy to:

Andrew Hohns
231 Spruce Street
Philadelphia PA 19106
Email:  andrewhohns@gmail.com

If to IIFC Manager:

IIFC Management LLC
2929 Arch Street, #1703
Philadelphia PA 19104
Email:  andrewhohns@gmail.com

With a copy to:

Andrew Hohns
231 Spruce Street
Philadelphia PA 19106
Email:  andrewhohns@gmail.com

If to Andrew Hohns:

231 Spruce St.
Philadelphia, PA 19106
Email: andrewhohns@gmail.com

19.     Complete Understanding; Amendment; Waiver.  This Agreement, together with the other Transaction Documents, constitutes the complete understanding between the Parties with respect to the infrastructure finance business contemplated herein and the employment of Hohns and any additional employees, and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter hereof, and no statement, representation, warranty or covenant has been made by any Party with respect thereto except as expressly set forth herein.  This Agreement shall not be altered, modified, amended or terminated except by a written instrument signed by each of the Parties. Any waiver of any term or provision hereof, or of the application of any such term or provision to any circumstances, shall be in writing signed by the Party or Parties charged with giving such waiver.  Waiver by any Party of any breach hereunder by any other Party shall not operate as a waiver of any other breach, whether similar to or different from the breach waived.  No delay on the part of any Party in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by any Party of any such right or remedy shall preclude other or further exercise thereof.

20.     Remedies; Enforcement.    The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.  Notwithstanding anything to the contrary contained herein or in any other related agreement or document, each of the Parties shall have the authority to enforce rights and remedies hereunder and under the other related agreements and documents against any Party in breach of its respective representations and obligations set forth herein and therein.

21.     Arbitration.  Any controversy or dispute between any of the Parties arising out of any of the terms or conditions of this Agreement shall be submitted to an independent professional arbitration association in New York.   Any arbitrator(s) selected must have significant arbitration experience relating to the securities industry.  The disputing Parties shall select an arbitrator by mutual agreement within thirty (30) days of the date of the demand for arbitration.  If such Parties are unable to agree on the selection of an arbitrator within such time, each Party shall select an arbitrator and, in the event there results an even number of arbitrators, such arbitrators shall select one additional arbitrator.   Such dispute or controversy shall be decided by majority vote among the arbitrators selected.   The cost of the arbitration shall be borne equally by the disputing Parties, unless the arbitrator(s) order otherwise.   The arbitration shall be binding with no right of appeal.

22.     Severability.   If any provision of this Agreement or the application of any such provision to any Party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law.  If the final judgment of a court of

competent jurisdiction declares that any provision of this Agreement, is invalid or unenforceable, the Parties agree that the court making the determination of invalidity or unenforceability shall have the power, and is hereby directed, to reduce the scope, duration or area of the provision, to delete specific words or phrases and to replace any invalid or unenforceable provision with a provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable provision, and this Agreement shall be enforceable as so modified.

23.    Survivability.  The provisions of this Agreement which by their terms call for performance subsequent to termination of this Agreement, shall so survive such termination.

24.    Governing Law; Consent to Jurisdiction.   This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed within that State, without regard to its conflict of laws provisions.

25.    Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

26.    Headings.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

*[Signature Page Follows.]*

**IN WITNESS WHEREOF**, each of the Parties has duly executed this Agreement as of the date first above written.

**MARINER INFRASTRUCTURE
INVESTMENT MANAGEMENT LLC**

By: _____

Name: Andrew Hohns

Title: President & CEO


**IIFC MANAGEMENT LLC**

By: _____

Name: Andrew Hohns

Title: Managing Member


**MARINER INVESTMENT GROUP, LLC**

By: _____

Name: Peter O'Rourke

Title: General Counsel


**ANDREW HOHNS**

_____

Andrew Hohns

102948206 v1

**Schedule A**

The following expenses will be paid by MIIM:

- ○ Compensation of any employees (inclusive of cost of benefits package, and employer payroll and tax deductions, if any, except that until the first closing of the Specified Funds, such costs of the benefit packages shall be a Mariner expense)
- ○ Agreed-upon percentage of distribution expenses (as detailed below)
- ○ Office service fees (e.g., telephone, internet, Blackberry service, etc.)
- ○ All travel and entertainment expenses, if any
- ○ Costs of outside accounting and tax preparation services for MIIM, and any consultant retained by MIIM with the consent of the Managing Member
- ○ Research and research-related equipment (such as Bloomberg terminals)
- ○ Office space rental cost
- ○ Information technology ("**IT**") costs, if any, beyond those covered by Mariner as provided below
- ○ Office supplies and furnishings, if applicable
- ○ Any other business related expense

Distribution Expenses. All internal and external distribution fees associated with the placement of assets in the Specified Funds shall be paid from the gross revenues attributable to the Specified Funds and shall therefore be borne by the Specified Fund Service Provider and Mariner pro rata based on their economic interest therein (i.e., 67%/33%). For the avoidance of doubt, the internal distribution fees shall include any compensation paid to Mariner employees in connection with the solicitation or placement of interests on behalf of the Specified Funds, and the rate of compensation paid to such Mariner employees shall not exceed 15% of Mariner's portion of the relevant gross revenues without prior agreement of the parties hereto.

Infrastructure Expenses. For the avoidance of doubt, Mariner shall provide MIIM with information technology ("IT") support and maintenance services, consistent with services currently provided by Mariner to similarly situated employees, including IT installation, if necessary, IT technical support, and maintenance of MIIM's computer, phone, market data interface, disaster recovery and other similar information technology systems; *provided, however*, that MIIM shall be responsible for (and shall reimburse Mariner on a current basis, to the extent Mariner would otherwise bear) all costs or other expenses associated with MIIM-dedicated equipment, hardware or software, and any extraordinary costs or expenses associated with the storage, retrieval, production or conversion of data held on such systems.

**Schedule B**

**Exhibit A**

**HOHNS EMPLOYMENT AGREEMENT**

**Exhibit B**

**FORM OF EMPLOYMENT AGREEMENT**

**Exhibit C**

**FORM OF SPONSORSHIP AGREEMENT SUPPLEMENT**

   This SPONSORSHIP AGREEMENT SUPPLEMENT (this "**Supplement**") is made as of the __ day of _____, 20__ by and between MARINER INVESTMENT GROUP, LLC, a limited liability company organized under the laws of Delaware ("**Mariner**"), MARINER INFRASTRUCTURE INVESTMENT MANAGEMENT LLC, a limited liability company organized under the laws of _Delaware_____ ("**MIIM**"), Andrew Hohns ("**Hohns**"), and [NAME OF SPECIFIED FUND SERVICE PROVIDER], a [limited liability company organized] under the laws of _____ ("**Service Provider**"),

<u>W I T N E S S E T H</u> :

   WHEREAS, Mariner, MIIM and Hohns are party to that certain Sponsorship Agreement, dated as of _____ (the "**Sponsorship Agreement**") (capitalized terms used but not defined herein have the meanings assigned to them in the Sponsorship Agreement);

   WHEREAS, [MIIM] has formed [NAME OF SPECIFIED FUND] ("the **Fund**");

   WHEREAS, the parties hereto desire to set forth in this Supplement (as a supplement to the Sponsorship Agreement) their agreement regarding the structure and management of Fund,

   NOW, THEREFORE, in consideration of the foregoing, the mutual covenants hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

   1. <u>Fund as Specified Fund</u>.  The Fund is hereby deemed a Specified Fund under the Sponsorship Agreement, with all the rights, privileges, liabilities and obligations of a Specified Fund under the Sponsorship Agreement.

   2. <u>Service Provider as Specified Fund Service Provider</u>.  Service Provider is hereby added as a Party to the Sponsorship Agreement and, upon its execution of the Services Agreement with respect to the Fund, shall serve as the Specified Fund Service Provider of the Fund, with all the rights, remedies, powers, privileges, liabilities and obligations of a Specified Fund Service Provider under the Sponsorship Agreement.

   3. <u>Complete Understanding; Amendment; Waiver</u>.   This Supplement, together with the Sponsorship Agreement, constitutes the complete understanding between the parties hereto with respect to the subject matter contemplated herein, and supersedes all other prior agreements and understandings, both written and oral, between such parties with respect to the subject matter hereof, and no statement, representation, warranty or covenant has been made by any such party with respect thereto except as expressly set forth herein.  This Supplement

shall not be altered, modified, amended or terminated except by a written instrument signed by each of the parties hereto.  Any waiver of any term or provision hereof, or of the application of any such term or provision to any circumstances, shall be in writing signed by the party or parties charged with giving such waiver.  Waiver by any party of any breach hereunder by any other party shall not operate as a waiver of any other breach, whether similar to or different from the breach waived.  No delay on the part of any party in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by any party of any such right or remedy shall preclude other or further exercise thereof.

4.     Severability.   If any provision of this Supplement or the application of any such provision to any party hereto or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Supplement, or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law.  If the final judgment of a court of competent jurisdiction declares that any provision of this Supplement, is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability shall have the power, and is hereby directed, to reduce the scope, duration or area of the provision, to delete specific words or phrases and to replace any invalid or unenforceable provision with a provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable provision, and this Supplement shall be enforceable as so modified.

5.     Survivability.  The provisions of this Supplement which by their terms call for performance subsequent to termination of this Supplement, shall so survive such termination.

6.     Governing Law; Consent to Jurisdiction.   This Supplement shall be governed by and construed and enforced in accordance with the laws of the State of New York applicable to agreements made and to be wholly performed within that State, without regard to its conflict of laws provisions.

7.     Counterparts.   This Supplement may be executed in one or more counterparts, each of which shall be deemed to be an original but all of which together will constitute one and the same instrument.

8.     Headings.  Section headings used herein are for convenience of reference only, are not part of this Supplement and shall not affect the construction of, or be taken into consideration in interpreting, this Supplement.

*[Signature Page Follows.]*

**IN WITNESS WHEREOF**, each of the parties hereto has duly executed this Supplement as of the date first above written.

**MARINER INVESTMENT GROUP, LLC**

By:_____
Name: Peter O'Rourke
Title: General Counsel


**MARINER INFRASTRUCTURE INVESTMENT MANAGEMENT LLC**

By:_____
Name:
Title:


**ANDREW HOHNS**

_____
Andrew Hohns


**[NAME OF SPECIFIED FUND SERVICE PROVIDER]**

By:_____
Name:
Title:

Address:[2]


Email:

---

[2] **[INSERT ADDRESS AND EMAIL OF SPECIFIED FUND SERVICE PROVIDER FOR PURPOSES OF NOTICES]**

# __Exhibit C__

**EXECUTION COPY**

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "**Agreement**") is made this 13th day of March, 2012 by and between MARINER INVESTMENT GROUP, LLC. ("**Mariner**") and Andrew Hohns ("**Hohns**"),

## W I T N E S S E T H :

WHEREAS, Mariner wishes to employ Hohns pursuant to the terms and conditions hereinafter set forth to assist in the activities as contemplated in that certain Sponsorship Agreement, dated as of March 13, 2012 (the "**Sponsorship Agreement**"), among Mariner, Mariner Infrastructure Investment Management LLC ("**MIIM**"), Hohns, and IIFC Management LLC ("**IIFC Manager**"), as a Specified Fund Service Provider (defined in the Sponsorship Agreement), pursuant to which Mariner, through MIIM, expects to establish the International Infrastructure Finance Company Fund (the "**Initial Fund**"), which will operate as a specialty finance vehicle to enhance the credit rating on selected infrastructure related debt securities and portfolios thereof; and

WHEREAS, Hohns desires to be employed by Mariner pursuant to the terms and conditions hereinafter set forth to assist in the activities as contemplated in the Sponsorship Agreement,

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.  <u>Employment; Term</u>.  Mariner hereby employs Hohns, and Hohns hereby accepts employment with Mariner, in accordance with and subject to the terms and conditions set forth herein.  The term of this Agreement (the "**Term**") shall commence as of the date first written above (the "**Effective Date**") and continue until such time as this Agreement is terminated in accordance with <u>Section 7</u>.

2.  <u>Duties</u>.

    (a)  *Capacity of Hohns with respect to MIIM and Mariner*.  During the Term, Hohns shall serve in the capacity of President and CEO of MIIM.  Hohns may also be engaged in other business activities with Mariner, the nature and terms of which (including compensation arrangements) shall be agreed between Mariner and Hohns under a separate agreement.

    (b)  *Duties of Hohns*.  Hohns shall be responsible for the management of MIIM's day-to-day activities, reporting to the MIIM board of directors to be formed in accordance with the Sponsorship Agreement.

    (c)  *Allocation of Hohns's Time*.  During the Term, Hohns, as President and CEO of MIIM, shall devote such time to MIIM activities as is reasonably necessary for the prudent management of MIIM.

3.     Exclusivity and Outside Activities.

(a)     Exclusivity.   Except as otherwise agreed between Mariner and Hohns, all Exclusive Activities (defined below) of Mariner and/or Hohns shall be conducted through MIIM and a correspondent non-advisory services provider (in respect of the Initial Fund, IIFC Manager, and in respect of any subsequent new fund products, the related Specified Fund Service Provider (defined in the Sponsorship Agreement) or another entity to be designated by Hohns from time to time) on substantially the same terms as set out in the Sponsorship Agreement.   For the avoidance of doubt, "**Exclusive Activities**" shall mean any infrastructure investment activities relating to platforms or vehicles established subsequent to December 2011 by Mariner or Hohns with a primary investment strategy of investment in project finance or other infrastructure-related credit assets; provided, however, an "Exclusive Activity" shall not include any activity where (a) Mariner and Hohns agree in good faith that one such party lacks the talent required to skillfully execute such activity, and such party is unable to cure the identified deficiency within a reasonable period of time, or (b) either Mariner or Hohns wishes to pursue the activity, and the other party does not. At such time as the other party determines it does not wish to pursue such activity, the party wishing to pursue such activity may do so, and such activity shall no longer be an Exclusive Activity with respect to the party wishing to pursue such activity but shall remain (for a period of two years from such determination) an Exclusive Activity with respect to the party that has declined to pursue such activity.

(b)     Outside Activities.  Hohns may engage in charitable, civic, and other business and non-business activities, so long as such outside activities do not give rise to any conflicts of interest with his responsibilities to MIIM, Mariner, or its affiliates, do not interfere with the performance of Hohns' duties hereunder and would not otherwise constitute a violation of this Agreement.

4.     Compensation.





5.     <u>Buyout and Capital Transactions</u>.  Hohns shall have a Buyout Option and certain rights upon the occurrence of a Capital Transaction, each as detailed and defined in that certain Mariner-Hohns Buyout Option Agreement between Hohns and Mariner, dated March __, 2012.

6.     <u>Benefits</u>.  Hohns shall be entitled to receive any and all benefits afforded to employees of Mariner, including deferred compensation, 401(k) or other retirement plans, medical insurance, dental insurance, group life, disability insurance, pension and other benefit plans that are made generally available by Mariner to its employees; provided, however, that Mariner, in its sole discretion, may at any time amend or terminate its benefit plans or programs.

7.     <u>Termination of Agreement</u>.

(a)     Hohns may resign as an employee of Mariner at any time upon ninety (90) days' notice to Mariner; provided, however, that if Hohns resigns other than for Good Reason (defined below), Mariner shall be entitled to receive (subject to the same terms and conditions discussed herein, including the Buyout Option) from any venture undertaken by Hohns that engages in the Exclusive Activities, an amount equal to product of: (i) the Post-Termination Mariner Revenue Share (defined in the Sponsorship Agreement), *multiplied by* (ii) Hohns's earnings from such venture, but only during such periods that Hohns, directly or indirectly, holds more than 25% (in the aggregate, if relevant) voting equity or economic interests in the corporate entity conducting such venture.   Hohns shall be deemed to resign with "**Good Reason**" if he resigns in connection with (w) a reduction by MIIM of his title, role or responsibilities, (x) a change in his reporting relationships, (y) a failure to obtain commitments for the Initial Fund of at least $100 million on or prior to the date that is twelve (12) months from the Effective Date of the Sponsorship Agreement (provided that the first closing of the Initial Fund has not taken place by such date), or (z) a material breach by Mariner of any obligation owed to Hohns or any Specified Fund Service Provider under this Agreement or any other related agreement or document, and such breach remains uncured for sixty (60) days after written notice of the breach has been received.

(b)     In the event the Initial Fund does not obtain commitments for at least $100 million on or prior to the the date that is twelve (12) months from the Effective Date, Mariner may immediately terminate this Agreement.  Further, Mariner may at any time terminate this Agreement immediately for "Cause."   For purposes of this Agreement, the term "**Cause**" shall mean any of the following:  (i) perpetration by Hohns of an intentional fraud against or affecting Mariner, or any of its affiliates, or any customer, client, agent or employee of Mariner, or any of their affiliates;  (ii) any willful

or intentional act by Hohns that is reasonably expected to result in material harm to the business being conducted by Mariner or any of its affiliates; (iii) a conviction (including conviction on a nolo contendere plea) of any felony; (iv) the intentional failure or refusal of Hohns to perform his duties hereunder; or (v) any other material breach of this Agreement.  Mariner may not terminate this under subsections (i), (ii), (iv) or (v) unless (1) it has furnished written notice to Hohns containing reasonable detail of the facts supporting the determination of Cause, and the Section, if any, of this Agreement relied upon five (5) business days in advance of the proposed date of termination, and (2) Hohns has failed to cure such default within such five (5) business day period.

8.     <u>Non-Solicitation</u>.  During the term of this Agreement and during the Non-Solicitation Period (as defined below) following the termination of such Agreement, Hohns will not, without the prior written consent of Mariner or MIIM, directly or indirectly, (i) cause or attempt to cause a client or investor of Mariner or MIIM to terminate or materially reduce its business with Mariner or MIIM, or engage in any course of conduct that reasonably may be expected to cause such termination or material reduction; or (ii) solicit, or accept solicitations from, a client or investor of Mariner or MIIM to conduct business with such client or investor, unless in conjunction with Mariner or MIIM; or (iii) subject to the remainder of this Section 8, solicit or hire any person who was employed by Mariner at any time during the six (6) months prior to the termination of this Agreement, or attempt to cause or influence any such person to terminate his or her relationship with Mariner.  Hohns understands that the provisions of this Section 8 may limit his ability to earn a livelihood in a business that competes with Mariner but nevertheless Hohns agrees and hereby acknowledges that the consideration provided herein is sufficient to justify the restrictions contained in such provisions.  For purposes of this Agreement, "**Non-Solicitation Period**" shall mean, if Hohns terminates this Agreement other than for Good Reason or is terminated for Cause, one (1) year.  Notwithstanding the above, upon the exercise of the Buyout Option or the occurrence of a Capital Transaction (each as defined in the Hohns-Mariner Buyout Option Agreement), or upon termination pursuant to the failure to raise the Initial Fund, or if Hohns terminates this Agreement for Good Reason, there shall be no Non-Solicitation Period.

9.     <u>Regulatory Issues</u>.  Mariner is a registered investment adviser with the Security and Exchange Commission.  As such, Hohns agrees to abide by Mariner's Code of Ethics, a copy of which has been provided to Hohns.  Hohns is also required to be familiar with, and abide by, the restrictions and other information contained therein.  Hohns hereby represents that there are no outstanding, pending or threatened legal or regulatory actions against Hohns and/or Hohns's former firm (as to which Hohns is related).  Hohns agrees that he will not conduct securities transactions on behalf of client accounts with brokers who are Relatives of Hohns or with any brokerage firm that employs Relatives of Hohns.  "**Relatives**" for this purpose include spouse, children,  parents, siblings, first cousins, and parents and siblings of spouse and parents.

10.     <u>Complete Understanding; Amendment; Waiver</u>.  This Agreement, together with the Sponsorship Agreement executed contemporaneously with this Agreement, constitutes the complete understanding between the parties hereto with respect to the employment of Hohns and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof, and no statement, representation, warranty or

covenant has been made by either party with respect thereto except as expressly set forth herein. This Agreement shall not be altered, modified, amended or terminated except by a written instrument signed by each of the parties hereto. Any waiver of any term or provision hereof, or of the application of any such term or provision to any circumstances, shall be in writing signed by the party charged with giving such waiver. Waiver by either party hereto of any breach hereunder by the other party shall not operate as a waiver of any other breach, whether similar to or different from the breach waived. No delay on the part of Mariner or Hohns in the exercise of any of their respective rights or remedies shall operate as a waiver thereof, and no single or partial exercise by Mariner or Hohns of any such right or remedy shall preclude other or further exercise thereof.

11.     Arbitration.  Any controversy or dispute between the parties arising out of any of the terms or conditions of this Agreement shall be submitted to an independent professional arbitration association in New York.  Any arbitrator(s) selected must have significant arbitration experience relating to the securities industry.  The parties shall select an arbitrator by mutual agreement within thirty (30) days of the date of the demand for arbitration. If the parties are unable to agree on the selection of an arbitrator within such time, each party shall select an arbitrator and the two arbitrators shall select a third arbitrator.  Any of the two of the three arbitrators that agree shall decide the matter.  The cost of the arbitration shall be borne equally by the parties, unless the arbitrator(s) order otherwise.  The arbitration shall be binding with no right of appeal.

12.     Severability.  If any provision of this Agreement or the application of any such provision to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement, or the application of such provision to such person or circumstances other than those to which it is so determined to be invalid or unenforceable, shall not be affected thereby, and each provision hereof shall be enforced to the fullest extent permitted by law.  If the final judgment of a court of competent jurisdiction declares that any provision of this Agreement is invalid or unenforceable, the parties hereto agree that the court making the determination of invalidity or unenforceability shall have the power, and is hereby directed, to reduce the scope, duration or area of the provision, to delete specific words or phrases and to replace any invalid or unenforceable provision with a provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable provision, and this Agreement shall be enforceable as so modified.

13.     Survivability.  The provisions of this Agreement that by its terms call for performance subsequent to termination of Hohns' employment hereunder, or of this Agreement, shall so survive such termination.

14.     Headings.  Section headings used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

*[Signature Page Follows.]*

**IN WITNESS WHEREOF**, each of the parties hereto has duly executed this Agreement as of the date first above written.

**MARINER INVESTMENT GROUP, LLC**

By:

Name:  Peter O'Rourke
Title:   General Counsel

**ANDREW HOHNS**

Andrew Hohns

[Signature Page to Employment Agreement]

# **<u>Exhibit D</u>**

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## IIFC II-A GP, LLC

This Limited Liability Company Agreement (this "Agreement") of IIFC II-A GP, LLC (the "Company"), effective as of June 5, 2019, is adopted by **IIFC Management LLC** ("IIFC Management") and **MIG GP Holdings, LLC** ("MIG", and together with IIFC Management, the "Members").

*Section 1. Formation of the Company.* Upon the filing of a certificate of formation of the Company with the Secretary of State of the State of Delaware on even date herewith (the "Certificate of Formation"), the Members hereby form a limited liability company pursuant to the Delaware Limited Liability Company Act, 6 Del. C. Section 18-101, et seq., as amended from time to time (the "Delaware Act"). Andrew Hohns shall be an authorized person within the meaning of the Delaware Act to file the Certificate of Formation with the Office of the Secretary of State of Delaware.

*Section 2. Interests and Admission.* The Company shall be authorized to issue a single class of Limited Liability Company Interests (the "Interests"), including any and all benefits to which the holders of such Interests may be entitled pursuant to this Agreement, together with all obligations of such holders to comply with the terms and provisions of this Agreement. Simultaneously with the execution and delivery of this Agreement and the filing of the Certificate of Formation with the Office of the Secretary of State of the State of Delaware, the Members are admitted as members of the Company in respect of the Interests.

*Section 3. Registered Office and Registered Agent.* The registered office of the Company in the State of Delaware is 251 Little Falls Drive, Wilmington, New Castle County, Delaware 19808 and the registered agent for service of process on the Company in the State of Delaware is Corporation Service Company. The Managing Member (as defined below) may from time to time change the registered office of the Company to such other place or the registered agent of the Company to such other person as the Managing Member deems appropriate.

*Section 4. Company Purposes.* The purpose of the Company is to conduct any activities permitted by law.

*Section 5. Capital Contributions.* The Members have contributed to the Company such property, services or money in the amount set forth opposite the Members' names on *Exhibit A* hereto. Additional capital contributions may be made in such amounts as the Managing Member determines to be necessary.

*Section 6. Capital Accounts.*

(a)     The Company shall maintain for each Member a separate capital account in accordance with this Section 6 and in accordance with the rules of Treasury Regulations Section l.704-l(b)(2)(iv) promulgated under the Internal Revenue Code of 1986, as amended (the "*Code*"). Each Member's capital account shall have an initial balance equal to such Member's initial capital contribution to the Company. Each Member's capital account shall be increased by the sum of (a) the amount of cash constituting additional contributions by such Member to the capital of the Company, plus (b) any income, profits or gain allocated to such Member's capital account pursuant to Section 7. Each Member's capital account shall be reduced by the sum of (x) the amount of cash and the fair market value of any property distributed by the Company to such Member, plus (y) any expense, deduction or loss allocated to such Member's capital account pursuant to Section 7.

(b)      The foregoing provisions and the other provisions of this Agreement relating to the maintenance of capital accounts are intended to comply with Treasury Regulations issued under Section 704(b) of the Code and shall be interpreted and applied in a manner consistent with such Treasury Regulations. The Managing Member shall be authorized to make appropriate amendments to the allocations of items pursuant to Section 7 if necessary in order to comply with Section 704 of the Code or applicable Treasury Regulations thereunder; provided, that no such change shall have an adverse effect upon the amount distributable to any Member pursuant to this Agreement or the timing of such distribution.

**Section** 7. ***Allocation of Items of Company Income, Gain, Deduction and Loss; Distributions; Tax Allocations.***

(a)      All items of income, gain, loss, deduction, and credit will be allocated 33% to MIG and 67% to IIFC Management, except for any Other Fees (as defined in the limited partnership agreement of International Infrastructure Finance Company II-A, L.P.) received by the Company, which shall be allocated between the Members in a manner consistent with the allocation of such Other Fees that would result if such Other Fees had been included as gross revenue received by Mariner Infrastructure Investment Management, LLC ("MIIM") for purposes of the definition of "Net Manager Revenue" in that certain Sponsorship Agreement dated as of March 13, 2012 by and among MIG, IIFC, MIIM and Andrew Hohns (the "Sponsorship Agreement"). No distribution may be made to any Member if, after giving effect to the distribution, in the judgment of the Managing Member, either (i) the Company would not be able to pay its debts as they become due in the ordinary course of business, or (ii) the fair value of the total assets of the Company would not at least equal its total liabilities. Subject to the foregoing limitation, the Company shall make such distributions to the Members in a *pro rata* manner as the Managing Member determines in its discretion, subject to the maintenance by the Company of appropriate reserves.

(b)      All items of income, gain, loss, deduction and credit shall be allocated to comply with (i) the "qualified income offset" and "stop loss" provisions of Treasury Regulations Section 1.704-l(b)(2)(ii)(d); (ii) the "partnership minimum gain chargeback" provisions of Treasury Regulations Section 1.704-2(f); and (iii) the "nonrecourse debt minimum gain chargeback" provisions of Treasury Regulations Section 1.704-2(i)(4).

(c)      For U.S. federal income tax purposes, items of income, gain, loss, deduction, and credit shall be allocated to the Members in accordance with the allocations of the corresponding items for capital account purposes under this Section 7, except that items with respect to which there is a difference between tax and book basis will be allocated in accordance with Section 704(c) of the Code, the Treasury Regulations thereunder and Treasury Regulations Section 1.704-l(b)(4)(i).

(d)      Notwithstanding anything to the contrary in this Agreement, with respect to the Buyout Option Agreement between Hohns and Mariner Investment Group, LLC, dated March 13, 2012 (the "Buyout Agreement"), the provisions of this Section 5, Section 6 and this Section 7 are deemed to have occurred subsequent to the Buyout Date (as defined below) of such Buyout Option (as defined in the Buyout Agreement).  For the avoidance of doubt, nothing in this Agreement shall prejudice any entity or individual's position with respect to the Buyout Option, including the Members' position with respect to the fair market value of the Mariner Revenue Share (as of the Buyout Date as defined in the Buyout Agreement and Sponsorship Agreement) pertaining to funds or vehicles engaging in the Exclusive Activities (as defined in the Employment Agreement and Sponsorship Agreement) formed before or after the Buyout Date.

### Section 8. Management.

(a)     Subject to section (b) below, the management and control of the Company shall be vested entirely in IIFC Management (the "Managing Member"). The Managing Member shall have all the rights and powers that are conferred by law or are otherwise necessary, advisable, or convenient in order to discharge its duties and to manage the business and affairs of the Company.

(b)     Notwithstanding anything to the contrary in this Agreement, until the date of the completion of the sale and purchase transaction pursuant to the exercise of the Buyout Option (the "Buyout Date") by Andrew Hohns of the Buyout Option (pursuant to and as defined in the Buyout Agreement), (i) MIG shall have the rights set forth in *Exhibit B* and (ii) the applicable actions listed on *Exhibit B* shall require the prior written consent of MIG to become effective.  For the avoidance of doubt, *Exhibit B* and all rights (including consent rights) of MIG set forth therein shall terminate and be of no further effect from and after the Buyout Date.

(c)     The Members agree that all determinations, decisions and actions made or taken by the Managing Member, in accordance with this Agreement shall be conclusive and absolutely binding upon the Company, the Members and their respective successors, assigns and personal representatives.

(d)     No person dealing with the Company shall have any obligation to inquire into the power or authority of the Managing Member acting for such purposes on behalf of the Company.

### Section 9. Addition of Additional Members; Transfer or Issuance of an Interest; Withdrawal of a Member.
No additional members may be admitted without the approval of the Members. Except as expressly provided herein, no current or future member may transfer any portion of its Interest in the Company without the consent of the Members (such a transferee being hereinafter referred to as a "Permitted Transferee"). A Permitted Transferee shall become a substituted member automatically upon a transfer that complies with this Section 9. Except as provided in mandatory provisions of the Delaware Act and pursuant to the second sentence of this Section 9, no right is given to any member to dissociate from the Company.

### Section 10. Events of Bankruptcy.
A member does not cease to be a member upon the happening of any of the events specified in Section 18-304 of the Delaware Act except with the written consent of the Members.

### Section 11. Dissolution and Term of the Company; Distribution upon Dissolution of the Company.

(a)     The Company shall dissolve upon any act or event requiring dissolution under the Delaware Act. Subject to an earlier dissolution as described in the preceding sentence, the Company shall have a perpetual duration.

(b)     Subject to the Delaware Act, after all liabilities of the Company have been satisfied or duly provided for, the remaining assets of the Company shall be distributed to the Members pro rata in accordance with their positive capital account balances, as adjusted in accordance with Section 7.

### Section 12. Limitation of Liability and Indemnification.

(a)     The Members shall not be liable for the debts, obligations and liabilities of the Company ("Company Obligations"), whether arising in contract, tort, or otherwise, and the Members shall be indemnified by the Company to the fullest extent allowed by the Delaware Act against any losses,

judgments, liabilities, expenses and amounts paid in settlement of any claims sustained against the Company or against the Members in connection with the Company Obligations.

(b)    The Company may purchase and maintain liability, indemnification or other similar insurance on behalf of itself, or for any person who is or was a member, officer, employee or agent of the Company or who is or was serving at the request of the Company as a director, manager, officer, trustee, employee, agent or similar functionary of another foreign or domestic corporation, limited liability company, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise, against any liability asserted against or incurred by the Company or person serving in such a capacity or arising out of its status as such a person or entity, whether or not the Company would otherwise have the power to indemnify such person against that liability.

(c)    The power to indemnify or obtain insurance provided in this Section 12 shall be cumulative of any other power of the Members or any rights to which such a person or entity may be entitled by law, this Agreement, the Certificate of Formation of the Company, contract, other agreement, vote or otherwise.

**Section 13. Fiscal Year; Books and Records.** The fiscal year of the Company for any financial statement and U.S. federal income tax purposes shall end on December 31 of each calendar year unless the Members designate another fiscal year. The Managing Member shall keep or cause to be kept at the address of the Managing Member (or at such other place as the Managing Member shall advise the other Members in writing) full and accurate books and records of the company.

**Section 14. Partnership Tax Returns; Tax Matters Partner.**

(a)    The Managing Member shall cause to be prepared and timely filed all tax returns required to be filed for the Company. The Members hereby agree that the Company shall be treated as a partnership for U.S. federal tax purposes, and further agree not to take any position or to make any election, in a tax return or otherwise, inconsistent therewith. The Managing Member may, in its discretion, make, or refrain from making, any income or other tax elections for the Company that it deems necessary or advisable, including, for U.S. federal income tax purposes, an election pursuant to Section 754 of the Code.

(b)    The Managing Member is hereby designated as the Company's "Tax Matters Partner" under Section 6231(a)(7) of the Code. The Managing Member is specifically directed and authorized to take whatever steps the Managing Member, in its discretion, deems necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under applicable Treasury Regulations. Any Member shall have the right to participate in any administrative proceedings relating to the determination of Company items at the Company level and shall be responsible for any expenses incurred by such Member in connection with such participation.

**Section 15. Liquidation Value Safe Harbor Election.** Each Member, by executing this Agreement, agrees that:

(a)    When and if Proposed Treasury Regulations Section 1.83-3(1) and the proposed revenue procedure contained in Notice 2005-43, 2005-24 I.R.B. 1, (together, the "Proposed Guidance") or any substantially similar rules become effective, the Company is authorized and directed to elect the safe harbor described therein, under which the fair market value of any Interest in the Company that is transferred in connection with the performance of services will be treated as being equal to the liquidation value of that Interest (the "Safe Harbor").

(b)       While the election described in Section 15(a) remains effective, the Company and each of the Members (including any person to whom an interest in the Company is transferred in connection with the performance of services) shall comply with all requirements of the Safe Harbor described in the Proposed Guidance with respect to all Interests in the Company that are transferred in connection with the performance of services.

*Section 16. Amendment.* This Agreement may only be amended in a writing signed by the Members.

*Section 17. Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware.

*Section 18. Counterparts.* This Agreement may be executed in any number of counterparts with the same effect as if all the parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one instrument.

[SIGNATURE PAGE FOLLOWS]

Executed as of the date first written above.

MEMBERS:

**IIFC MANAGEMENT LLC**

By: _____

Name: Andrew Hohns

Title: Managing Member

**MIG GP HOLDINGS, LLC**

By: _____

Name: Peter O'Rourke

Title: Authorized Person

**<u>Exhibit A</u>**

| <u>Member</u> | <u>Capital Contribution</u> |
|---|---|
| **IIFC Management LLC** | **$67.00** |
| **MIG GP Holdings, LLC** | **$33.00** |

## **Exhibit B**

Notwithstanding anything to the contrary in this Agreement, the prior written consent of MIG shall be required:

1. to approve or reject any change of control of the Company, or the transfer or issuance of interest in the Company by a Member other than MIG (other than a transfer as set forth in the Sponsorship Agreement, or transfer made to (or for the benefit of) the Member(s) or their immediate family members for estate planning purposes) that would result in the Non-MIG Members, or an entity such Non-MIG Members control, owning less than 50% of the interests in the Company;

2. to approve or reject the acquisition (i.e., holding a 25% or greater ownership interest) or control of, or other joint venture by the Company (or its subsidiaries) with, another investment adviser or company;

3. to give final approval of all changes to the governing documents of any of the pooled investment vehicles managed or advised by the Company (the "Funds"), and changes in key service providers related to the businesses, which include the adviser, prime brokers, administrators, auditors and counsel. The approval of such changes shall not be unreasonably withheld or delayed by MIG;

4. to approve the content of any post-termination provisions resident in any employment agreement with the Company (including any modification thereof);

provided, that MIG shall be deemed to have granted the required consent if it does not object to a request for such consent within five (5) days after receipt of such consent request made pursuant to Section 18 of the Sponsorship Agreement.

In addition, notwithstanding anything to the contrary in this Agreement, MIG shall have the following rights as relating to the Company:

5. the right to access all information associated with the Company and any subsidiary of the Company, including, but not limited to, all relevant business activities of the Company, its subsidiaries or the Funds (including full disclosure of position level, investment and redemption flows, investor lists and any other information associated with the Company, its subsidiaries or any Fund);

6. the right to (i) require the Company to institute risk parameters and controls upon such entity and any Fund consistent with MIG's (or its affiliates) traditional risk tolerance and policies, including but not limited to policies and procedures governing the Company's and its subsidiaries' investment advisory activities (e.g., compliance procedures designed to comply with Rule 206(4)-7 of the Investment Advisers Act of 1940 or other applicable laws mandated by the FSA or any other applicable regulatory or government body having jurisdiction over the Company's business and activities) ("Risk Constraints"), and (ii) to monitor compliance with such Risk Constraints. Such Risk Constraints shall be mutually agreed upon in good faith by MIG and the Non-MIG Members, and may include, but are

not limited to, operational risk protocols related to the Company and its businesses, and risk assessments related to the investment activities of the Company and general portfolio composition of the Funds;

7. to meet with the Non-MIG Members, as well as any other Company principal or employee, at any reasonable time to discuss any and all facets of the Company's (and its subsidiaries') business operations and activities, including the business operations and activities of the Funds. More specifically, a designated member of the senior management team of MIG (or its designee) shall have the right to participate (but not necessarily as an official member) on any of the committees or other operating groups formed by the Company (or its subsidiaries), including but not limited to any management committee, investment committee or compliance committee. Notwithstanding the above, upon reasonable notice (but in no case less frequently than monthly), MIG shall have the right to meet with the non-MIG Members or any other Company principal or employee to discuss, ask questions and receive any information concerning all facets of the Company's (including its subsidiaries') business activities, including the business activities of the Funds; and

8. to require the Company to enforce any post termination provisions contained in this Agreement or an employment agreement with any Company employee.

Notwithstanding the foregoing, the Non-MIG Members shall maintain sole control of the budget of the Company, including compensation of the Members and all employees. With the consent of MIG, which shall not be unreasonably withheld or delayed, the Non-MIG Members shall be permitted to admit (or accept the resignation of) any additional equity owners of the Company; *provided, however*, and any subsequent equity owners shall represent to Mariner that they will fulfill their fiduciary and legal obligations to investors of the collective entities and any customers of the other businesses; and *provided further* that the Non-MIG Members, or an entity they control, shall not at any time own less than 50% of the voting interests of the Company.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Demand for arbitration was caused to be served by certified mail, and was served by electronic mail, on September 17, 2019, to the following parties:

Peter J. O'Rourke
500 Mamaroneck Avenue
Harrison, New York 10528
Email: peter@marinercapital.com

Matthew Solum, P.C.
Kirkland & Ellis LLP
601 Lexington Avenue,
New York, NY 10022
Email: msolum@kirkland.com

Brian W. Shaffer